**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| JOAN BENNETT, Administratrix of the Estate of Walter Bennett,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 04-CV-10011-RCL<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF UNITED STATES' MOTION TO DISMISS**

**INTRODUCTION**

Plaintiff's action arises from the murder of Walter Bennett in April 1967.[1] Pursuant to FED. R. CIV. P. 12(b)(1), the action must be dismissed because it is jurisdictionally barred by the two-year statute of limitations of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.[2]

---

[1] Walter Bennett was one of three brothers murdered by Stephen Flemmi in 1967. See Bennett (Edward) v. FBI, Civil Action No. 02-CV-111802 RCL (concerning the death of William Bennett) (hereinafter "William Bennett"); Bennett (William) v. United States, Civil Action No. 03-CV-11443 RCL (concerning the death of Edward "Wimpy" Bennett) (hereinafter "Edward Bennett").

[2] Plaintiff Joan Bennett has filed a companion suit in her individual capacity, along with

It is First Circuit law that accrual under the discovery rule is measured by an objective standard. Plaintiff presented her FTCA administrative claim to the Federal Bureau of Investigation ("FBI") on or after March 14, 2003. However, by September 1999 *at the latest*, Plaintiff should have been aware of the FBI's reported connection to the decedent's death. This is because the basis for Plaintiff's claim was publicly revealed during the prosecution of the decedent's murderers and was widely reported in the Boston media, particularly following Judge Wolf's opinion of September 15, 1999. Furthermore, subjectively, it is apparent from several news reports that Plaintiff was indeed aware of the FBI's reported connection to the decedent's death by at least December 1999.

Because Plaintiff filed her claim more than two years after it accrued, the suit is untimely and "forever barred" pursuant to the FTCA's two-year statute of limitations.

## BACKGROUND

### I.   The Complaint

The Complaint alleges that H. Paul Rico, while a Special Agent for the Boston office of the FBI, recruited Winter Hill gang member Stephen Flemmi to be an FBI informant and then developed him into a "Top Echelon" informant. Compl. ¶¶ 22, 23, 24. The Complaint alleges that in order to protect Flemmi's informant status, Rico promised Flemmi that he would not be prosecuted for any crimes while serving as an informant. Compl. ¶¶ 23, 25. According to the Complaint, this promise was made despite the fact that the FBI and Rico were aware that Flemmi

prevent the murder. Compl. ¶¶ 41, 43, 44. Further, the Complaint alleges that Rico failed to provide investigators information regarding the murder. Compl. ¶ 47.

The case is brought by Joan Bennett, as administratrix of the Estate of the deceased, Walter Bennett. Compl. ¶ 6. According to the Complaint in Joan Bennett's companion case, brought on her own behalf, eight of the decedent's children reside in the Boston metropolitan area. See Joan Bennett v. United States, Civil Action No. 03-CV-11442-RCL, Am. Compl. at ¶¶ 1-7, 10 (Docket No. 15).

## II.    Criminal Proceedings

Flemmi and Frank Salemme were indicted for the murder of Walter Bennett in 1996. See United States v. Francis P. Salemme, James J. Bulger, Stephen J. Flemmi, Robert P. Deluca, and James M. Martorano, Crimn. No. 94-10287-MLW, Third Superseding Indictment, ¶ 1(e), p. 6 & Racketeering Act #23, pp. 33-34 (D. Mass.) (attached hereto as Exhibit 1). Following extensive hearings as a result of Flemmi's assertion of an immunity defense based on his FBI informant status, Judge Wolf of this Court issued a lengthy ruling on September 15, 1999. United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999). Among other things, Judge Wolf's ruling detailed his understanding of the relationship between Flemmi and the FBI. In December 1999, charges against Salemme for the murder of Walter Bennett were dropped in exchange for his plea of guilty to racketeering.[3]

### III. Media Coverage[4]

#### A. Generally

Beginning in the late 1980s, the local press in Boston began to report on a presumed relationship between the FBI and Whitey Bulger.[5] By the mid-to-late 1990s, the media was reporting that Bulger's close associate, Flemmi, also enjoyed a protected status with the FBI. See, e.g., Patricia Nealon, Flemmi says he, Bulger got FBI's OK on crimes, THE BOSTON GLOBE, June 26, 1997.[6] Newspaper articles also specifically linked Flemmi and the FBI to the Bennett

---

[4]For ease of reference, the articles cited in this section—except those cited in the footnotes, which are separately marked as indicated—are organized, in the order they are cited, in Exhibit 2, which is attached hereto.

[5]As early as 1988, The Boston Globe reported Bulger's "special relationship" with the FBI. See United States v. Salemme, 91 F. Supp. 2d 141, 155 n.5 (D. Mass. 1999) (referencing 1988 article "reporting that Bulger had a special relationship with the FBI, which had provided him protection in many investigations"). The Globe and other publications issued numerous follow-up reports over the next ten years spelling out Bulger and Flemmi's relationship with the FBI in increasing detail. See, e.g., Dick Lehr and Kevin Cullen, Liquor Purchase Fuels Friction Over FBI-Whitey Bulger Tie, THE BOSTON GLOBE, Nov. 11, 1990 (describing Bulger as FBI informant); Sean P. Murphy, Tape Topic: FBI Link to Whitey Bulger, THE BOSTON GLOBE, Feb. 8, 1991 (describing tape recording in which two criminals stated that Bulger never got arrested because he was friends with Connolly); Shelley Murphy, Finding his Way Home; Reputed Crime Boss Returns to Old Haunts, THE BOSTON GLOBE, July 31, 1994 (describing Bulger as informant); Richard Chacon, Three Reputed Mobsters have Longstanding Ties to Each Other, THE BOSTON GLOBE, Jan. 6, 1995 (same); Dick Lehr, Bulger's Flight Spares FBI Burden of Ties being Aired, Insiders Say, THE BOSTON GLOBE, Mar. 5, 1995 (same); Patricia Nealon, Flemmi says he, Bulger got FBI's OK on crimes, THE BOSTON GLOBE, June 26, 1997 (same); Patricia Nealon, FBI Loyalty to Mob Duo is Detailed; DEA, Others Kept in Dark about Bulger, Flemmi Ties, THE BOSTON GLOBE, Jan. 9, 1998 (same); Law Enforcement Officials' Lament about an Elusive Foe: Where was Whitey?, THE BOSTON GLOBE, Sept. 20, 1998 (reporting on suspicions that FBI protected Bulger and Flemmi from investigations and indictments). For ease of

murders. See, e.g., Ralph Ranalli, <u>Flemmi's lawyer contends fed let his crimes slide</u>, BOSTON HERALD, Jan. 14, 1998 (discussing murders of the Bennett brothers); Patricia Nealon, <u>On Mafia history, Flemmi takes a courtroom stand</u>, THE BOSTON GLOBE, Aug. 25, 1998 (reporting on Flemmi's trial, relationship with Rico, "deal with the FBI," and refusal to answer questions about the murders of the three Bennett brothers); Ralph Ranalli, <u>Rifleman's refrain remains the fifth</u>, BOSTON HERALD, Aug. 25, 1998 (same); Shelley Murphy and Patricia Nealon, <u>Ex-agent Retraces Gang War; Tells How FBI Cultivated Mob Pair in Violent 60's</u>, THE BOSTON GLOBE, Jan. 10, 1998 (discussing Rico's knowledge of Flemmi's involvement in the 1960s gang wars in Boston).

Certain reports specifically alleged that, in 1969, Rico tipped Flemmi off to indictments for the attempted murder of a local lawyer and the murder of the decedent's brother, William Bennett, so that Flemmi could flee the Boston area. These reports also suggested that Rico suborned perjury through a cooperating witness to ensure that the charges against Flemmi would be dropped, thus guaranteeing Flemmi's uninhibited return. Ralph Ranalli, <u>Mobster: I had license to kill; Flemmi says FBI knew he was murderer</u>, BOSTON HERALD, Jan. 7, 1998; Patricia Nealon, <u>Ex-agent Denies Tipping off Flemmi</u>, THE BOSTON GLOBE, Jan. 15, 1998 (reporting that

---

June 26, 1997; Ralph Ranalli, <u>Ex-FBI man to testify at Mob trial</u>, BOSTON HERALD, Aug. 4, 1997 (describing Rico as agent who forged FBI's bond with Flemmi); Ralph Ranalli, <u>Did FBI get help 'flipping' Mob killer Barboza?</u>, BOSTON HERALD, Aug. 5, 1997, (discussing "the FBI's decades-long relationship with wiseguys Stephen 'The Rifleman' Flemmi and James 'Whitey' Bulger"); Ralph Ranalli, <u>Hearings may dig into FBI dealings with Mob</u>, BOSTON HERALD, Dec. 30, 1997 (describing Rico as Flemmi's "handler" at the FBI); Ralph Ranalli, <u>Separate trials eyed for Mob</u>

Rico denied engineering Flemmi's surrender to charges in 1969 and playing role in dismissal of charges). Another article insinuated that the FBI refrained from diligently pursuing Flemmi when he was accused of murdering the Bennett brothers. Ralph Ranalli, <u>Former FBI agent testifies Salemme's '72 bust no setup</u>, BOSTON HERALD, May 6, 1998.

Furthermore, in the aftermath of the indictments, there were widespread reports in the 1990s regarding the Walter Bennett murder prosecution. <u>See</u>, <u>e.g.</u>, Ellen O'Brien, <u>4 Murder Charges Added Against Flemmi, Salemme</u>, THE BOSTON GLOBE, May 22, 1996 (discussing indictment of the Bennett brothers' murderers). In particular, significant public attention was directed toward the evidentiary hearings prompted by Flemmi's immunity defense, which culminated in Judge Wolf's <u>Salemme</u> decision which addressed the existence and scope of the FBI relationship with Flemmi. <u>See</u>, <u>e.g.</u>, <u>supra</u> Ralph Ranalli, <u>Former FBI agent testifies Salemme's '72 bust no setup</u>, BOSTON HERALD, May 6, 1998 ("Defense lawyers for Flemmi, Salemme and three other wiseguys have alleged the bureau protected Flemmi and Bulger in exchange for intelligence on their Italian Mob rivals and even their own Winter Hill gang allies."); Ralph Ranalli, <u>Mobster's plea deal reopens unsolved murder probes</u>, BOSTON HERALD, Aug. 9, 1998 ("Judge Wolf is now holding hearings to explore allegations of serious FBI misconduct in how it handled [] informants."); Ralph Ranalli, <u>Flemmi mum about murders, but admits betraying close pal</u>, BOSTON HERALD, Aug. 29, 1998 (discussing murders of all three Bennett brothers); <u>Salemme, supra</u>; Shelley Murphy, <u>Salemme Pleads Guilty to Racketeering;</u>

former FBI supervisor admitted pocketing $7,000 in bribes from the pair and tipping them to cases.").

Further, the <u>Salemme</u> decision directly concerned the prosecution of Flemmi and others regarding, inter alia, the murder of the decedent as well as the murders of the decedent's two brothers, Edward and William Bennett. <u>See</u> <u>Salemme</u>, 91 F. Supp. 2d at 307. Coverage of the pre-trial proceedings leading to the <u>Salemme</u> decision included reports of the release of a late-1960s FBI memorandum in which an agent quoted Flemmi as saying that Walter Bennett's murder was "all for the best and that he was beginning to think aggressively and could have caused additional problems in the city." According to the reports, the memo states that Flemmi advised the FBI that "the Italian element" was aware of and pleased that Walter Bennett was gone and that the FBI should not waste its time looking for Bennett. <u>See</u> <u>supra</u> David Weber, <u>Flemmi's lawyer contends feds let his crimes slide</u>, BOSTON HERALD, Jan. 14, 1998.

### B.    Beneficiaries' Statements in Published Reports

In addition to the wealth of general media coverage of the FBI-Rico-Flemmi relationship allegations and the prosecution of those accused of murdering Walter Bennett, several of the decedent's children have been quoted in newspaper articles pertaining to these subjects.

In December 1999, the decedent's son William Bennett was reported as stating that the Salemme plea deal left him disgusted with the criminal justice system. Joe Heaney, <u>Sons of slain men mixed on decision</u>, BOSTON HERALD, Dec. 10, 1999. The same article quoted William

newspaper article that discusses the Salemme plea bargain. The article specifically mentions the grand jury investigation concerning the relationships between Flemmi, Bulger and the FBI. See Andrea Estes, 'Tired' Mob boss ends fight, pleads guilty, BOSTON HERALD, Dec. 10, 1999.

In January 2000, decedent's daughter Susan Bennett was quoted as saying that she "knows" that Bulger and Flemmi were involved in her father's death. See Dave Wedge, Killing Field; Families look for closure at burial site, BOSTON HERALD, Jan. 15, 2000 (story discussing how "news spread across the city that the bodies of three suspected Mob war victims had been unearthed from a Dorchester dumping ground"). Covering the same dig at which Susan Bennett was quoted in the Boston Herald, the Boston Globe's story of the search referenced Judge Wolf's September 1999 decision in Salemme and the Bulger and Flemmi ties to the FBI. See Shelley Murphy and John Ellement, Search is Tied to Alleged Mob Hits; Police Dig in Gully for Victims' Bodies, THE BOSTON GLOBE, Jan. 14, 2000. See also Federal investigators find 3 bodies in Boston believed tied to mob case, THE PATRIOT LEDGER (Quincy, Mass.), Jan. 14, 2000 ("Flemmi . . . secretly worked as an FBI informant for decades while conducting mob business, according to federal court documents.").

## DISCUSSION

I.  **Legal Standard**

For the purposes of considering a motion to dismiss under FED. R. CIV. P. 12(b)(1), all well-pleaded facts alleged in the Complaint are assumed to be true. Muniz-Rivera v. United

Highly relevant to the motion before the Court, the party that invokes federal court jurisdiction carries the burden of proving its existence. Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003) (quoting Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)). Accordingly, because filing an FTCA claim within the limitations period is a jurisdictional prerequisite, Roman v. Townsend, 224 F.3d 24, 28 (1st Cir. 2000), it is Plaintiff's burden to establish that her claim complies with the statute of limitations. The failure of Plaintiff to carry this burden requires dismissal of the action. FED. R. CIV. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

## II.     This Court Lacks Jurisdiction Because Plaintiff's Complaint is Barred by the FTCA's Two-Year Limitation Period

A waiver of sovereign immunity must be "unequivocally expressed" in statutory text and such text "is to be strictly construed, in terms of scope, in favor of the sovereign." Department of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999) (quoting Lane v. Pena, 518 U.S. 187, 192 (1996)). The FTCA is a statutory waiver of the United States' sovereign immunity. 28 U.S.C. §§ 1346(b), 2671-2680. Among its conditions is a statute of limitations. 28 U.S.C. § 2401(b); United States v. Kubrick, 444 U.S. 111, 117-18 (1979). Accordingly, the timely filing of an FTCA claim is a mandatory condition of the United States' waiver of sovereign immunity and is a jurisdictional prerequisite that cannot be waived or ignored. See Roman, 224 F.3d at 28; Attallah v. United States, 955 F.2d 776, 669 (1st Cir. 1992).

filed her administrative claim with the FBI on or after March 14, 2003. Compl. ¶ 6. Thus, in order for Plaintiff's claim to be timely, it must have accrued after March 14, 2001.

Federal law determines when a claim accrues for purposes of the FTCA. Heinrich v. Sweet, 44 F. Supp. 2d 408, 415 n.8 (D. Mass. 1999). The "general" rule is that a claim accrues at the time of the injury. Skwira, supra; Gonzalez, supra. In limited circumstances, an objective "discovery rule" has been employed. Skwira, 344 F.3d at 78. In extraordinary circumstances, the two-year statute of limitations has been tolled where an FTCA plaintiff has been able to establish "fraudulent" or "deliberate" concealment by the defendant. Gonzalez-Bernal v. United States, 907 F.2d 246, 250 (1st Cir. 1990).

As the remainder of this brief will outline, whichever accrual rule this Court chooses to apply, Plaintiff's claim accrued before March 14, 2001. Accordingly, the Court lacks subject matter jurisdiction and must dismiss the action. FED. R. CIV. P. 12(h)(3).

### A.   Imputation of Beneficiaries' Knowledge to Estate

As an initial matter, it is well-established that where a beneficiary has full authority to file an administrative claim under the FTCA, the beneficiary's knowledge regarding the claim attaches to the estate. William Bennett v. FBI, 278 F. Supp. 2d 104, 113-14 (D. Mass. 2003). See also Cutting v. United States, 204 F. Supp. 2d 216, 221 (D. Mass. 2002); Booten v. United States, 95 F. Supp. 2d 37, 42 (D. Mass. 2000); Wozniak v. United States, 701 F. Supp. 259, 260-61 (D. Mass. 1998). In other words, in determining the appropriate date of accrual for an FTCA

the applicable state wrongful death statute to file an FTCA administrative claim. William Bennett, 278 F. Supp. 2d at 114. Under the wrongful death statute in Massachusetts, each of Walter Bennett's eleven children is a beneficiary. MASS. GEN. LAWS ch. 229, § 1. As such, each of Walter Bennett's eleven children could have filed an administrative claim on behalf of the Estate.

Accordingly, in order to determine whether Plaintiff has met her burden of establishing that jurisdiction exists, the accrual rules must be applied individually to each of Walter Bennett's children.

### B.  The Discovery Rule

In the First Circuit, the discovery rule is applicable in wrongful death cases and an *objective* test is used to determine whether a claim has accrued. Skwira, 344 F.3d at 74, 78. An FTCA claim accrues under the discovery rule "once a plaintiff knows, or in the exercise of reasonable diligence should know, (1) of her injury and (2) sufficient facts to permit a reasonable person to believe that there is a causal connection between the government and her injury." Id. at 78.

Accordingly, applying the beneficiary-to-estate imputation rule discussed above and applied by this Court in William Bennett to the present case, the FTCA's two-year limitation period began to run under the discovery rule at the moment *any* one of Walter Bennett's children knew, or should have known through an exercise of reasonable diligence, of (1) the injury and (2)

make actionability certain. Id. at 81. Rather, the facts are "sufficient" under the Skwira accrual test where they allow the agency simply to begin to investigate the claim. Id. As the First Circuit indicated, this is not a high standard. Id. at 70 ("The Claimant need only indicate on the SF-95 '(1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought.'") (quoting Santiago-Ramirez v. Sec'y of Dept. of Def., 984 F.2d 16, 19 (1st Cir. 1993)). In fact, even an ongoing criminal investigation is not a barrier to filing a claim once sufficient facts are available to a reasonably diligent claimant because an agency can abey consideration of an administrative claim pending an investigative outcome. Id. at 81 n.17.[7]

Applying these principles to the present case, Plaintiff has not complied with the FTCA's statute of limitations under the discovery rule.

### 1. Knowledge of the Injury

It is clear that the decedent's children were aware of their father's murder shortly after his disappearance in April 1967. Compl. ¶ 46. Accordingly, part one of the Skwira test is satisfied. Moreover, an indictment for the decedent's murder was issued in 1996.

### 2. Sufficient Facts

By September 1999 *at the latest*, there existed sufficient facts to permit Plaintiff to believe that there was a causal connection between the FBI and her injury. Skwira, 344 F.3d at 78. This is particularly evident inasmuch as this standard is to be *objectively* applied by the Court and the "sufficient" facts need only permit the agency to begin to investigate the claim. Id.

The 1996 federal indictment targeted several declared mob leaders who were alleged to have tormented the Boston area for decades. Most important to the present case, the indictment charged two of the mob leaders with murdering Walter Bennett. As discussed ante, Boston media coverage of this major prosecution was extensive and eight of the decedent's children live in metropolitan Boston. See Joan Bennett v. United States, Civil Action No. 03-CV-11442-RCL, Am. Compl. at ¶¶ 1-7, 10 (Docket No. 15). The media coverage intensified after Flemmi asserted an immunity defense based on his status as an FBI informant. Simply put, the public sprouting of FBI misconduct allegations that accompanied Flemmi's assertion that he was immune from prosecution could not have been missed or ignored. Accordingly, it is no surprise that a notice analysis takes into consideration the widespread publicity concerning a claim, regardless whether the prospective plaintiff claims to have been aware of the publicity. See, e.g., United Klans of America v. McGovern, 621 F.2d 152, 154 (5th Cir. 1980); In re Beef Industry Antitrust Litigation, 600 F.2d 1148, 1169 (5th Cir. 1979); Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975); Leftridge v. United States, 612 F. Supp. 631, 635 (W.D. Mo. 1985).[8]

The Boston mob prosecution garnered significant public attention even before Flemmi's

---

[8]Certain case law suggests that the fact of publication alone cannot place a plaintiff on notice of a claim. However, such broad statements are dicta and the cases are largely distinguishable on the facts. For example, in Heinrich v. Sweet, 44 F. Supp. 2d 408, 416-17 (D. Mass. 1999), the court declined to find that obscure medical journals and other reports, which did not identify the relevant time periods or treating hospitals, were sufficient to establish notice. It

revelations. However, in order to determine the validity of Flemmi's immunity defense, Judge Wolf held public hearings, attempting to piece together several decades of an FBI-Bulger-Flemmi informant relationship. These hearings and the resulting opinion of September 15, 1999, were the events that, judicially, exposed the alleged improper informant relationship between the FBI and Flemmi that forms the basis of Plaintiff's claim. And again, as outlined supra, Judge Wolf's hearings and opinion attracted **substantial** media attention.

Thus, at the latest, Plaintiff—whose decedent was the victim of the murder that was one of the express subjects of the immunity hearings—was unquestionably put on notice of the FBI-Rico-Flemmi connection by Judge Wolf's written opinion of September 15, 1999, in which he catalogued his assessment of the relationship. See United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999). Judge Wolf's decision sent shockwaves throughout Boston and New England and it is beyond question that the decision provided more than "sufficient" facts to file a claim that would have permitted the FBI to investigate.

3.   **Reasonable diligence**

While a plaintiff cannot await an indictment if ample notice of a claim exists, Cutting v. United States, 204 F. Supp. 2d 216, 226-27 (D. Mass. 2002), under the circumstances presented here, a reasonably diligent plaintiff would have been aware of the indictment and/or prosecution of those alleged to have murdered the decedent, the father of eleven of the Estate's beneficiaries. Following the case would have unquestionably led the children directly to the discovery of the

proceedings of those alleged to have murdered their father, and at a minimum, "reasonable diligence" would require them to follow the well-publicized events of his murder trial. The beneficiaries of Walter Bennett's estate were not permitted to "bury [their] head in the sand." Skwira, 344 F.3d at 77 (quoting Diaz v. United States, 165 F.3d 1337, 1340 (11th Cir. 1999)).

This Court's decision in William Bennett v. FBI, 278 F. Supp. 2d 104 (D. Mass. 2003), is readily distinguishable. In that case, it was held that the plaintiffs' cause of action did not begin to accrue until nearly seven months after the release of the Salemme decision. This Court concluded that, in part because of the distance between Boston and the plaintiffs' residences (New Mexico and Florida), it was not unreasonable for the plaintiffs to have been unaware of the media reports surrounding the FBI-Rico-Flemmi revelations, or Judge Wolf's Salemme decision of September 15, 1999 for that matter.

Here, however, *eight beneficiaries live in the Boston metropolitan area.* See Joan Bennett v. United States, Civil Action No. 03-CV-11442-RCL, Am. Compl. at ¶¶ 1-7, 10 (Docket No. 15). Furthermore, inasmuch as these beneficiaries were located in Boston during the widely-publicized events concerning the prosecution of the alleged murderers of their father, and those criminal proceedings produced the widely-publicized revelations regarding Flemmi's alleged inappropriate relationship with the FBI, the length of time between the murder and the events of the 1990s is less significant to the present case than in William Bennett.[9]

---

[9]Equally distinguishable is Donahue v. FBI, 204 F. Supp. 2d 169 (D. Mass. 2002),

In sum, had Plaintiff been reasonably diligent, she would have known of the facts necessary to present her claim *no later* than the days following Judge Wolf's decision on September 15, 1999. Because Plaintiff waited over three-and-a-half years after that date to file her administrative claim, her claim is "forever barred."

### 4. Subjective Evidence

Notwithstanding that Plaintiff's claim began to accrue by September 1999 at the latest under the objective test set out in Skwira, a sample of the extensive print media coverage reveals that the Estate's beneficiaries were, in fact, aware of and following the Flemmi proceedings no later than December 1999. As discussed supra, three of the decedent's children were quoted in newspaper articles that establish their awareness and familiarity with the 1996-1999 criminal proceedings which publicly revealed the potential misconduct surrounding the FBI-Rico-Flemmi relationship. See supra pp. 7-8. Accordingly, not only can Plaintiff not meet her jurisdictional burden as set out by the Skwira *objective* test, Plaintiff cannot meet her burden under a *subjective* test.

It is clear from December 1999 and January 2000 news reports that quote the Estate's beneficiaries that they were aware of and following the criminal proceedings. The knowledge of all beneficiaries is imputed to the Estate for the purpose of determining the date of accrual. William Bennett, 278 F. Supp. 2d at 113-14. As such, by December 1999 *at the very latest*, Plaintiff knew of (1) her injury and (2) sufficient facts to permit her to believe that there was a

the suit must be dismissed. See McIntyre v. United States, 254 F. Supp. 2d 183 (D. Mass. 2003) (holding that press reports evidencing the plaintiff's knowledge of her claim commenced accrual); See also William Bennett, supra (holding that the plaintiff's receipt of newspaper article commenced accrual).

### C. Fraudulent Concealment or Equitable Tolling

Plaintiff's claim is not saved by the doctrines of fraudulent concealment or equitable tolling. To invoke the fraudulent concealment doctrine, Plaintiff must "show that the United States itself played a role in concealing the identity of the FBI tortfeasors; must plead with particularity the facts surrounding the concealment; and must be able to show due diligence in attempting to uncover those facts." William Bennett, 278 F. Supp. 2d at 119 (citing Gonzalez-Bernal, 907 F.2d at 250).

Again, as a threshold matter, the burden of proof to establish federal subject matter jurisdiction lies with the plaintiff. Skwira, 344 F.3d at 71. Plaintiff has not pled any facts that suggest that, in the face of an effort by Plaintiff to obtain facts sufficient to permit an agency investigation to commence, the FBI fraudulently concealed such facts. Unlike in William Bennett, Plaintiff has not pled any facts that she made an inquiry with the FBI and was rebuked.

Regardless, if Plaintiff claims that neither she nor the Estate's beneficiaries were aware of the Flemmi revelations until March 14, 2001, then Plaintiff did not proceed with reasonable diligence and fraudulent concealment is inapplicable. See supra at 14-16. Likewise, a plaintiff is

statute of limitations past September 15, 1999, the date of Judge Wolf's <u>Salemme</u> decision. This is because any fraudulent concealment, even if proved, ceased to be effective as of the public release of the <u>Salemme</u> decision. And at the *very* latest, the limitations period would not have been tolled past December 1999 inasmuch as several beneficiaries are quoted in newspaper articles related to and connected to the criminal prosecution and revelations of the 1990s. See <u>William Bennett</u>, 278 F. Supp. 2d at 119.

## CONCLUSION

For the foregoing reasons, Plaintiff's Complaint should be dismissed as to the United States.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

_____
ALLEN L. LANSTRA
STACEY BOSSHARDT
Trial Attorneys, Torts Branch
Civil Division, U.S. Department of Justice
P.O. Box 888, Benjamin Franklin Station
Washington, D.C. 20044
(202) 616-4272; (202) 616-5200 (FAX)
Allen.Lanstra@usdoj.gov

Attorneys for the United States