UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOAN BENNETT, ADMINISTRATRIX )
OF THE ESTATE OF )
WALTER BENNETT, )
    Plaintiff, )
 )
 ) Civil Action No.: 04CV10011
 )
VS. )
 )
 )
UNITED STATES OF AMERICA, and )
H. Paul Rico, )
    Defendants. )
 )

## PLAINTIFF'S OPPOSITION TO DEFENDANT UNITED STATES MOTION TO DISMISS

Plaintiff as Administratrix of the Estate of Walter Bennett (hereinafter collectively Plaintiff) submits this opposition to the Motion To Dismiss filed by the Defendant United States (Government).

Plaintiff filed the administrative claim against the Defendant within two years of learning critical facts establishing that the FBI was a potentially significant cause of their injuries and damages. These facts were actively concealed by the Defendant and were inherently unknowable, even through the exercise of reasonable diligence, prior to March 14, 2001 by the Plaintiff.

The essence of Plaintiff's claim is that in order to protect its illicit and secret relationship with its informants, the FBI ignored the murder of Walter Bennett. The FBI failed to abide by its

1

own rules and regulations relative to reporting, notification of supervisory officials, investigation and protection of the public. It also took affirmative actions to ratify and to endorse the illegalities perpetrated by its informants against the Plaintiff further emboldening these gangsters to continue their murder and mayhem and remain unaccountable for their actions. This evidence identifying the FBI and its agents as a cause of Plaintiff's injuries were not known, and could not reasonably have been discovered prior to March 14, 2001.

The Government's motion should be denied because the "discovery rule" determines the accrual date of this action, the plaintiff's claims are timely under the discovery rule, and plaintiff's claims are also timely under the doctrines of fraudulent concealment and equitable tolling. Dismissal is therefore inappropriate.

## APPLICABLE STANDARD

This Court has had the opportunity to set for the applicable legal standard in a number of accompanying cases which resulted from murderous and criminal actions of the Bulger Group and the FBI and its agents including *McIntyre, et al v. USA et al*, C.A. No.: 01-10408RCL and *Donahue v. FBI*, C.A. No.: 01-10433RCL. The Plaintiff takes the liberty of setting forth the standard espoused by this Court in the matter of Bennett et al v. FBI et al, C.A. No.: 02-11802RCL. That case is particularly germaine to this case as it concerns the brother of this decedent, Edward Bennett and the government relies on the same theories and arguments that news media publications and their mere existence without any proven knowledge of their existence and contents by the Plaintiff fulfills the burden of the governments Motion to Dismiss.

### Legal Standard

(Quoted from *Edward Bennett, et al v. FBI et al*, C.A. No.:02-1180202RCL,
Memorandum and Order on United States' Motion to Dismiss) (Exhibit 1)

"The motion before me is a motion to dismiss for lack of subject matter jurisdiction. In evaluating such a motion, I must view the plaintiffs well-pleaded factual allegations as true and draw all reasonable inferences therefrom. *Muniz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003). In addition, I may consider the complaint, affidavits or other sources of uncontested facts in reaching my conclusion as to whether subject matter jurisdiction has been properly asserted. *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

With regard to the plaintiffs substantive claims, I begin with the fundamental principle that no case can be asserted against the Untied States without its consent. The FTCA represents a compromise that allows plaintiffs to file tort claims against the United States in federal court so long as they first file administrative claims to the appropriate agency within two years after their tort claims accrue. 28 U.S.C. §2401(b); see also *United States v. Kubrick*, 444 U.S. 111, 117-18, 100 S.Ct. 352, 357 (1979); *Attallah v. United States*, 955 F, 2d 776, 779 (1st Cir. 1992); *Cutting v. United States*, 204 F. Supp. 2d 216, 221 (D. Mass. 2002). The filing of a timely admistrative claim under 28 U.S.C. §2401(b) is a jurisdictional requirement that cannot be waived. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002). Therefore, should a plaintiff fail to file a timely administrative claim, any action filed in court must be dismissed. Id"

"i. The Discovery Rule. In *Kubrick*, the Supreme Court distinguished situations involving application of the general rule from those involving application of the so-called discovery rule. See *Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359. The Court indicated that an exception to the general rule of accrual of a claim at the

3

time of injury is to be applied in those situations where the plaintiff did not know he or she had been injured, or where the facts regarding causation were unavailable to the plaintiff or were difficult to obtain. See id. The Court stated that the general rule is to be applied where a plaintiff may be ignorant of his or her legal rights, but is "in possession of the critical facts that he [sic] has been hurt and who has inflicted the injury". Id. The First Circuit has indicated that he standard in determining applicability of the discovery rule is objective – that is to say, the factual basis, including the fact of injury and knowledge as to its probable cause – must have been "inherently unknowable" at the time of the injury. See *Gonzalez*, 284 F.3d at 288-89. "Inherently unknowable" is defined as "incapable of detection by the wronged party through the exercise of reasonable diligence". Id."

ii. <u>Applicability of Discovery Rule in Wrongful Death Cases</u>. However, as I noted in an earlier case related to allegations of FBI misconduct, *Donahue v. FBI*, 204 F. Supp. 2d 169, 176 (D. Mass 2002), the Supreme Court has not "expressly rejected the use of the discovery rule in the context" of a wrongful death case. Id. at 176. Moreover, recent First Circuit case law indicates that "the discovery rule inapplicable in the wrongful death context absent clearer appellate authority. The cutting court noted that it would "not assume that the application of the discovery rule in the wrongful death context is unwarranted, simply because no Supreme Court of the First Circuit case contains and explicit holding to that effect." *Cutting*, 204 F.Supp. 2d. at 224. As I held in *Donahue*, I conclude in this case that

4

the discovery rule properly may be applied to wrongful death cases in this circuit."

## APPLICATION OF DISCOVERY RULE

As in the previously filed FTCA actions against the government, the discovery rule is applicable this matter.

The government in its Motion to Dismiss relies upon the premise that the extensive media coverage alone provides ample evidence that the Plaintiff knew or should have known enough to start the statute of limitations running well before the respective filing dates. However, this theory must be backed up by facts proving that the Plaintiff was aware of these articles and read them. This, of course, presupposes that the information contained in the particular article or articles is credible, accurate and provides the necessary connection to the governments duplicity in the death of Walter Bennett.

The Government has provided a series of articles beginning in November 20, 1985 up through September 14, 2000. The following is a summary of whether or not there is any connection in the article to this case. These articles have been examined based upon this Court's standard that it is only articles, "... in which a suggestion is made of Flemmi's operating under an informally confirmed FBI license to kill, that would put a reader on notice of the FBI's possible involvement in the Bennett murder." Edward Bennett, et al v. FBI, et al, C.A. No.: 02-11802RCL., Memorandum and Order on United States' Motion to Dismiss, Lindsay, J., at pg. 20.

Exhibit 2 (1) 9/20/88
Boston Globe    Law Enforcement Officials' Lament About an Elusive Foe: Where
                was Whitey? A Globe Spotlight Report
                A. No suggestion of Flemmi operating with an informal "license to kill"
                B. Contains FBI denial

5

Exhibit 2 (2) 11/11/90
Boston Globe          Liquor Purchase Fuels Friction Over FBI-Whitey Bulger Tie
                      A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (3) 2/8/91
Boston Globe          Tape Topic: FBI Link to Whitey Bulger
                      A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (4) 7/31/94
Boston Globe          Finding His Way Home Reputed Crime Boss Returns to Old Haunts
                      A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (5) 1/6/95
Boston Globe          Three Reputed Mobsters Have Longstanding ties to Each Other
                      A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (6) 3/5/95
Boston Globe          Sidebar Bulger's Flight Spares FBI Burden of Ties Being Aired, Insiders Say
                      A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (7) 5/22/96
Boston Globe          4 Murder Charges Added Against Flemmi, Saleme
                      A. Only mentions the adding of murder charges of Edward Bennett to Saleme and Flemmi
                      B. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (8) 6/26/97
Boston Globe          Flemmi Says He, Bulger got FBI's Ok on crimes
                      A. No suggestion of Flemmi operating with an informal "license to kill"
                      B. Contains FBI denial

Exhibit 2 (9) 8/4/97
Boston Herald         Ex-FBI Man To Testify at Mob Trial
                      A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (10) 8/5/97
Boston Herald         Did FBI Get Help 'Flipping' Mob Killer Barboza?
                      A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (11) 12/30/97
Boston Herald         Hearings May Dig Into FBI Dealings With Mob
                      A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (12) 1/7/98
Boston Herald        Mobster: I Had a License To Kill Femmi Says FBI Knew He Was
                     Murderer
                     A. Mentions this case
                     B. Mentions informant status
                     C. Contains denial of condoned murders by A.U.S.A. Fred M. Wyshah

Exhibit 2 (13) 1/9/98
Boston Globe         FIB Loyalty to Mob Duo is Detailed  DEA, Others Kept In Dark
                     About Bulger, Flemmi Ties
                     A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (14) 1/10/98
Boston Globe         Ex-Agent Retraces Gang War Tells How FBI Cultivated Mob Pair
                     In Violent '60's
                     A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (15) 1/14/98
Boston Herald        Flemmi's Lawyer Contends Fed Let His Crimes Slide
                     A. Flemmi alleges he had a "free pass on murder"
                     B. Contains FBI denial by H. Paul Rico

Exhibit 2 (16) 1/15/98
Boston Globe         Ex-Agent Denies Tipping Off Flemmi
                     A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (17) 1/28/98
Boston Herald        Separate Trial Eyes For Mob Defendants
                     A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (18) 5/6/98
Boston Herald        Former FBI Agent Testifies Salemme's '72 Bust No Set-Up
                     A. Mentions Edward Bennett case, FBI denies any duplicity in Salemme's
                     1972 arrest
                     B. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (19) 8/9/98
Boston Herald        Mobster's Plea Deal Reopens Unsolved Murder Probes
                     A. No mention of this case
                     B. No suggestion of Flemmi operating with an "informal license to kill"

Exhibit 2 (20) 8/25/98
Boston Globe         On Mafia History, Flemmi Takes a Courtroom Stand
                     A. Flemmi claims immunity
                     B. FBI denial
                     C. No suggestion of Flemmi operating with an "informal license to kill"

Exhibit 2 (21) 8/25/98
Boston Herald          Rifleman's Refrain Remains the Fifth
                       A. FBI denial
                       B. No suggestion of Flemmi operating with an "informal license to kill"

Exhibit 2 (22) 8/29/98
Boston Herald          Flemmi Mum About Murders, but Admits Betraying Close Pal
                       A. No suggestion of Flemmi operating with an "informal license to kill"

Exhibit 2 (23) 12/10/99
Boston Herald          Sons of Slain Men Mixed on Decision
                       A. William Bennett blaims Flemmi (This William Bennett is cousin, son of Edward Bennett, and not the son of Walter Bennett)
                       B. No suggestion of Flemmi operating with an "informal license to kill"

Exhibit 2 (24) 12/10/99
Boston Herald          "Tired" Mob Boss Ends Fight, Pleads Guilty
                       A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (25) 12/10/99
Boston Globe           Saleme Pleads Guilty To Racketeering Plea Deal Would Drop Murder Charges
                       A. Wolf rejects Flemmi's immunity
                       B. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (26) 1/14/00
Patriot Ledger         Federal Investigators Find 3 Bodies in Boston Believed Tied to Mob Case / One May be IRA Sympathizer from Quincy Missing Since '87
                       A. No suggestion of Flemmi operating with an "informal license to kill"

Exhibit 2 (27) 1/14/00
Boston Globe           Search Is Tied to Alleged Mob Hits Police Dig In Gully For Victims' Bodies
                       A. No suggestion of Flemmi operating with an informal "license to kill"

Exhibit 2 (28) 1/15/00
Boston Herald          Killing Field; Families Look for Closure at Burial Site
                       A. No suggestion of Flemmi operating with an informal "license to kill"

The United States' argument is that because the media reports were so widely available, a plaintiff exercising reasonable diligence should have discovered them, thus triggering a duty to inquire about potential FTCA claims and by extension causing the two (2) year notice period to begin. The government's position fails for a number of reasons.

a. The majority (26 of 28) of the Government's cited articles Exhibit 2 subsections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, and 28, contain no reference or any suggestion of Flemmi's having received an informal FBI, "license to kill", do not put anyone on notice of the FBI's possible involvement in the murder of Walter Bennett and therefore would not provide anything additional to the actual constructive knowledge of the Plaintiff.

b. The remaining articles, Exhibit #2, subsections 12 and 15 contain suggestions and innuendo that Flemmi was operating under an informally confirmed FBI immunity that allegedly could extend to murder, a fact which the FBI continues to deny. However, each Plaintiff's failure to become aware of these media reports is not indicative of a lack of due diligence. The following is a summary of the factors for each individual plaintiff.

The mere existence of these articles do not in and of themselves trigger the statute. The affidavits of the heirs must be examined to determine the level of knowledge and understanding thereof.

Francine Wilbanks (Exhibit 3), Geraldine Prosek (Exhibit 4), and Brenda Thorburg (Exhibit 5) all reside outside of Massachusetts, have not read any of the articles attached to the government's motion to dismiss, do not subscribe to any Boston newspapers or other media outlets and were not aware of any possible claim against the

9

FBI and/or the United States until they received correspondence and information from the Law Offices of Gannon & Hurley, P.C. in early September, 2002.

Robert Bennett (Exhibit 6), Walter Bennett, Jr. (Exhibit 7), and Judith Ewell (Exhibit 8) all stated that they had not read any of the articles attached to the government's Motion to Dismiss, do not monitor the Boston media outlets, never had any of the critical information and/or facts to connect the FBI and the United States and were not aware of any possible claim against the FBI and/or the United States until they received correspondence and information from the Law Offices of Gannon & Hurley, P.c. in early September, 2002.

Joan Bennett (Exhibit 9) states she had not ready any of the articles attached to the government's Motion to Dismiss, was not provided from any source any of the critical information and/or facts to connect the FBI and the United States and was not aware of any possible claim against the FBI and/or the Untied States until she received correspondence and information from the Law Offices of Gannon & Hurley, P.C. in early September, 2002.

Joan Bennett's affidavit is also significant because the government in its brief refers to the news article Joe Heancy, Sons of Slain Men Mixed On Decision, Boston Herald, December 10, 1999. Allegedly quoting William Bennett and referring to him as the son of Walter Bennett. In reality the William Bennett quoted was a cousin and the son of Edward Bennett, another of the Bennett brothers killed by Salemmi and Flemmi and the reference to him being Walter Bennett's son was a reporter's error. Joan Bennett's affidavit clears this matter up in detail. The William Bennett who was an heir to the

10

Estate of Walter Bennett died on Saturday, April 3, 2004 and thus the need for Joan Bennett's affidavit.

Nancy Derderian (Exhibit 10) states that she never monitored the Boston media until the government began digging for the bodies of the Bennett brothers in Hopkinton, Massachusetts in 2002. While she had not read any of the other articles attached to the government's Motion to Dismiss she did read, <u>Dave Wedge, Killing Field: Families Look for Closure at Burial Site, Boston Herald,</u> but only because her sister Susan was quoted. She further goes on to state that she got nothing else from that article and was not aware of any possible claim against the FBI and/or the United States until she received correspondence and information from the Law Offices of Gannon & Hurley, P.C. in early September, 2002. Of further significance is the fact that she lived in Georgia from 3/91 to 10/97.

Barbara Ann Bennett (Exhibit 11) is quoted by the government based upon the article by Andrea Estes, <u>Tired Mob Boss Ends Fight, pleads guilty, Boston Herald, December 10, 1999.</u> Ms. Bennett in her affidavit states that the reporter Andrea Estes called her after Salemmi had plead guilty to racketeering and not the murder of her father and asked how she felt about it. She states that she told the reporter all she wanted was answers, to know if were Flemmi and Salemmi were involved and that she was confused. She further states that she had not read any of the articles attached to the government's Motion to Dismiss, did not have any of the critical information and/or facts to connect the FBI and the United States and was not aware of any possible claim against the FBI and/or the United States until she received correspondence and information from the Law Offices of Gannon & Hurley, P.C. in early September, 2002.

11

The government refers to Susan Bennett (Exhibit 12) as being quoted in <u>Dave Wedge, Killing Field; Families Look For Closure at Burial Site, Boston Herald, January 15, 2000</u>, that she "knows" that Bulger and Flemmi were involved in her father's death. Ms. Bennett stated in her affidavit that these articles were published at the time the government was digging for her father's body in Hopkinton, Massachusetts. She further stated that she did not speak with reporters and expressed her thoughts that Flemmi was somehow involved (she denies referring to Bulger) and she did skim the articles looking for a reference to her father's name. Ms. Bennett states that she became so upset by the process she stopped reading or listening to anything to do with the whole matter. She stated that while she read some portions of the articles attached to the government's Motion to Dismiss she could only read portions before becoming too upset to continue. She stated she was not aware of the possibility of a claim against the FBI and/or the United States until she received correspondence from the Law Offices of Gannon & Hurley, P.C.

Of particular significance in Ms. Bennett's affidavit is the fact that the FBI came to her home in the 80's to pick up her mother to testify at a grand jury. At that time an FBI agent told her that the Angulo's had killed her father. She goes on in her affidavit to state that she thought it was Patrica, Angulo and the N.E. Mafia who killed her father, on opinioin also shared by her siblings Joan Bennett, Francine Wilbanks, Walter Bennett, Jr. and Judith Ewell. Obviously, the cover-up began early.

The significant amount of time between the death of Walter Bennett and the publications lend support to the Plaintiff's claims that they did not act unreasonably by

failing to keep track of items in the Boston Press. *Bennett et al v. FBI*, C.A. No.:02-11802RCL citing *Donahue*, 204 F.Supp.2d. at 177-78.

It is significant that in articles shown in exhibit #2, subsections 13, 14, 16, 17, 18, 22, 23, 46 and 47, there is denial by the government in the form of the FBI, co-defendant H. Paul Rico or the prosecutors or Judge Wolf of Flemmi's allegations.

"The standard by which a potential FTCA claimant is deemed to have acted with due diligence is one of reasonableness…" *Bennett*, C.A. No.: 02-11802RCL, pg.21, citing *Onlikow v. United States*, 682 F.Supp.77, 85 (b.d.c. 1988) (stating newspaper articles containing allegations do not necessarily place citizens on notice when there is no notice that these articles were read."); see also *Donahue*, F.Supp.2d. at 177.

### FRAUDULENT CONCEALMENT
(Quoted from Edward Bennett, et al v. FBI, et al, C.A. No.: 02-118202RCL) [Exhibit 1]

"The doctrine of equitable tolling suspends the running of a statute of limitations "if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit."*Gonzalez*, 284 F.3d at 291 (citing *Bernier v. Upjohn Co.*, 144 F.3d 178, 180 (1st Cir. 1998)); *see also Miceli v. FBI*, 2002 WL 31654948 at *9 (N. D. Ill. Nov. 21, 2002) (indicating equitable tolling requires due diligence to obtain information bearing on existence of claim, not its details). In *Gonzalez*, the court did not find equitable tolling of the statute appropriate, finding that tolling was precluded by a lack of diligence on the part of the plaintiff. The plaintiff, knowing both that her baby was injured and that the probable cause of the injury was medical negligence, failed to inquire into the federal employee status of the potential tortfeasors. *See id.* at 291-92. By contrast, Bennett, Jr.'s affidavit makes it clear that he did inquire about FBI involvement in his father's death after learning of a potential connection in the summer of 1998,

and that he gave up the inquiry because he received assurances that reasonably led him to believe that pursuit of the FBI was a dead end.

The closely related doctrine of fraudulent concealment is available "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part." *Gonzalez*, 284 F.3d at 292 (quoting *Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20, 25 (1st Cir. 1997)) (quotation marks omitted in original); *see also Cogburn v. United States*, 717 F. Supp. 958, 961-62 (D. Mass. 1989) (stating plaintiffs must show they were unable to discover concealed information within limitations period despite exercise of reasonable diligence and were thus barred from seeking redress in court). To succeed with such a claim, a plaintiff must show that "1) sufficient facts were [not] available to put a reasonable [person] in the plaintiff['s] position on inquiry notice of the *possibility* of fraud, and 2) plaintiff exercised due diligence in attempting to uncover the factual basis underlying this alleged fraudulent conduct." *Salois*, 128 F.3d at 25-26 (quoting *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir. 1987)). In this case, the plaintiff must show that the United States itself played a role in concealing the identity of the FBI tortfeasors; must plead with particularity the facts surrounding the concealment; and must be able to show due diligence in attempting to uncover those facts. *Gonzalez-Bernal v. United States*, 907 F.2d 246, 250 (1st Cir. 1990).

In the *Cogburn* case, the statute of limitations was equitably tolled because the court found that the plaintiff's doctors had falsified medical reports in order to cover up their negligence. *Cogburn*, 717 F. Supp. at 959. At one point, the plaintiff requested and received his falsified medical records, which he provided to an attorney for review. The attorney then advised the plaintiff that he had no basis for a claim of negligence. When the plaintiff later discovered that the records had been falsified, he immediately filed an administrative claim. *Id.* The court

14

found that because the original records were fraudulently concealed and the plaintiff exercised due diligence by requesting the records and reviewing them to evaluate his potential claims, the limitations period was tolled. *Id.* at 963. In *Gonzalez-Bernal*, the facts were different, and the court did not find the statute tolled as a consequence of fraudulent concealment. *Gonzalez-Bernal*, 907 F.2d at 250. The court noted that "the government is under no obligation to provide private citizens with information concerning ongoing criminal investigations.... 'Fraudulent concealment must consist of affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action. Mere silence of the Defendant and failure by the plaintiff to learn of the right of action, alone, are not sufficient.'" *Id.* (quoting *Chrysler Workers Ass'n v. Chrysler Corp.*, 663 F. Supp. 1134, 1151 (N.D. Ohio 1986))."

In the present case, the complaint alleges that Rico knew that Flemmi was involved in criminal activities, including murder, while he served as an FBI informant; that Rico filed false reports within the FBI, diverting attention away from Flemmi during criminal investigations; that Rico violated established policies and procedures of the FBI in order to continue the agency's improper relationship with Flemmi; and that the FBI concealed the truth regarding its tortious and wrongful actions for a period beginning before Bennett's murder and extending to the present day. Compl. ¶¶ 15, 24, 40, 42. In addition, Rico expressly denied any wrongdoing in regard to his relationship with Flemmi during the *Salemme* hearings in 1998. Pl. Opp. at 16. Other agents of the FBI made affirmative representations to Bennett, Jr. that there was no connection between the actions of the FBI and his father's death. W. Bennett Aff. at ¶ 6. Finally, the surviving Bennetts state explicitly that they believed the actions of Flemmi and Salemme to be the sole causes of their father's murder until at least July 2000. *Id.* at ¶ 5. I conclude that these facts are sufficient to state a claim that the FBI actively concealed its alleged involvement in the

15

encouragement, or at least condonation, of the criminal acts of Flemmi, including the murder of William Bennett. I therefore conclude that, in keeping with the rule enunciated in *Gonzalez-Bernal* and *Cogburn*, the limitations period was tolled from summer of 1998, when Bennett, Jr. first suspected that he might have a claim and began the inquiry that was stymied by the two unnamed FBI agents, to the summer of 2000, when both Edward Bennett and Bennett, Jr. became aware that evidence of the FBI's longstanding collusion with Flemmi was being presented in connection with the *Salemme* case.9 Whether this tolling be characterized as "equitable tolling" or tolling due to fraudulent concealment does not matter. The plaintiff has stated a claim for both.

The FBI actively and passively denied the claim of duplicity in the murder of Walter Bennett which raises and presents facts which support the doctrine of equitable tolling and fraudulent concealment. (Plaintiff's Complaint, pgs. 57, 58, and 59)

If the Plaintiff or any of the heirs made an inquiry to the FBI similar to William Bennett, Jr.'s inquiry in the Bennett v. FBI, C.A. No.: 02-11802RCL case, they would have had the same results. The FBI would have reasonably led him or her to believe "pursuit of FBI was a dead end".

As in the Bennett, supra, case, these Plaintiffs have:

a. Alleged that Rico knew that Flemmi was involved in criminal activities, including murder, while he served as an FBI informant

b. Alleged that Rico filed false report within the FBI, diverting attention away from Flemmi during criminal investigations

16

    c. Alleged that Rico violated established policies and procedures of the FBI in order to continuer the agencies improper relationship with Flemmi

    d. Alleged that the FBI concealed the truth regarding the tortuous and wrongful actions for a period before Edward Bennett's murder and extending to the present day

In addition, on numerous occasions, FBI agent H. Paul Rico and federal prosecutors made numerous denials of any such wrong doings in regard to his handler/informant relationship with Flemmi. If this Plaintiff or any of the heirs had made the same inquiry at any time as their cousin William Bennett, Jr. did they would have been presented with the same affirmative representations that there was no connection between the actions of the FBI and their father's death. Finally, the Plaintiff and the heirs collectively state in thier affidavits that until the Summer of 2001, they believed that Flemmi and Salemme were the sole causes of the death of their father.

Further, the FBI conducted an internal investigation in 1997 and concluded that there was not any evidence to support a prosecution of any of its agents for their handling of Bulger and Flemmi. Should the Plaintiffs' burden be higher than that of the Justice Department's Criminal Division?

## THE GOVERNMENT'S MOTION IS PREMATURE BECAUSE ACCRUAL IS A FACTUAL QUESTION FOR DETERMINATION AT TRIAL

Finally, dismissal is inappropriate because accrual is a factual question for determination at trial. As stated in a similar FTCA action, "[t]he question whether an FTCA plaintiff knew or should have known the critical facts of his claim, and the subsidiary question of whether he exercised due diligence to discover them are ordinarily matters for the finder of fact to determine at trial." Guccione, 670 F. Sup. At 536 (emphasis added); see, also, Barrett v. United States, 689 F. 2d 324, 330 (2nd Cir. 1982). Likewise, in Orlikow v. United States, 682 F. Supp. 77 (D.D.C,

1988), where plaintiffs had neither actual notice of Government wrongdoing nor read the articles upon which the Government urged constructive notice, the district court refeuse to dimiss their FTCA claims as a matter of law because "[t]he trier of fact must resolve the issue of diligence and notice." Orlikow, 682 F. Supp. At 85 (emphasis added).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully requests that his honorable Court deny the United States' Motion to Dismiss.

Respectfully submitted,
Joan Bennett, Administratrix
Of the Estate of Walter Bennett
By its attorney,

Paul J. Gannon, Esq.
BBO No.: 548865
Gannon and Hurley, P.C.
P.O. Box E46
470 West Broadway
South Boston, MA 02127
617-269-1993

Dated: April 12, 2004

CERTIFICATE OF SERVICE

I, Paul J. Gannon do hereby certify that I served the attached PLAINTIFF'S OPPOSITION TO DEFENDANT UNITED STATES MOTION TO DISMISS was sent first class mail to counsel of record as follows:

Allen L. Lanstra, Esq.
Stacey Bosshardt, Esq.
Trial Attorneys, Torts Branch
Civil Division, U.S. Department of Justice
PO Box 888, Benjamin Franklin Staion
Washington, D.C. 20044
202-616-4272

Peter Parker, Esq.
One commercial Wharf North
Second Floor
Boston, MA 02110

_____
Paul J. Gannon, Esq.
Gannon & Hurley, P.C.
P.O. Box E46
470 West Broadway
South Boston, MA 02127
(617) 269-1993
BBO#: 548865

Dated: April 12, 2003