# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JOAN BENNETT, Administratrix of     )
    the Estate of Walter Bennett,     )
                            )
        Plaintiff,          )
                            )
v.                                    )        Civil Action No. 04-CV-10011-RCL
                            )
UNITED STATES OF AMERICA, *et al.*     )
                            )
        Defendants.       )
                            )

## UNITED STATES' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

### INTRODUCTION

Plaintiff's Opposition to Defendant United States' Motion to Dismiss ("Opposition") fails to cure the jurisdictional defects caused by Plaintiff's failure to present a timely administrative claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. Unable to rebut the showing that a reasonable person would have been armed with sufficient facts to begin a timely investigation, Plaintiff asserts that none of the newspaper articles supporting the motion expressly stated that "Flemmi [was] operating with an informal 'license to kill'" and, therefore, the limitations period did not begin to run. Plaintiff makes this argument notwithstanding her acknowledgment that several family members either read or were quoted in many of those articles. In any event, Plaintiff filed suit more than two years beyond the issuance of the <u>Salemme</u> opinion and the massive publicity generated by that ruling. For these reasons, proper application of the discovery rule, as well as the doctrines of fraudulent concealment and equitable tolling, bar Plaintiff's claim pursuant to the FTCA's two-year statute of limitations.

## DISCUSSION

### I.    Plaintiff's Claim is Barred under the Discovery Rule

The Opposition acknowledges that an objective standard measures accrual under the discovery rule, but then applies a subjective standard. Applying the objective standard directed by Skwira v. United States, 344 F.3d 64 (1st. Cir. 2003), Plaintiff's administrative claim was untimely. Moreover, the subjective affidavits attached to the Opposition themselves establish that Plaintiff's claim is time-barred.

#### A.    The Standard for Determining Accrual under the Discovery Rule

An FTCA claim accrues under the discovery rule "once a plaintiff knows, or in the exercise of reasonable diligence should know, (1) of her injury and (2) sufficient facts to permit a reasonable person to believe that there is a causal connection between the government and her injury." Skwira, 344 F.3d at 78. This is an objective standard.

As the Plaintiff herself quotes this Court as holding:

> The First Circuit has indicated that [t]he standard in determining applicability of the discovery rule is objective—that is to say, the factual basis, including the fact of injury and knowledge as to its probable cause—must have been "inherently unknowable" at the time of the injury. See Gonzalez, 284 F.3d at 288-89. "Inherently unknowable" is defined as "incapable of detection by the wronged party through the exercise of reasonable diligence."

Opposition at 4 (quoting Bennett, 278 F. Supp. 2d at 109). See also Skwira, 344 F.3d at 81 (citing Attallah v. United States, 955 F.2d 776, 780 (1st Cir. 1991)).

**B.    Application of the Accrual Standard**

    **1.    The Factual Basis was not "Inherently Unknowable" Prior to March 14, 2001**

The Salemme[1] opinion, as well as the extensive media coverage in the 1990s, demonstrate that the factual basis for Plaintiff's FTCA claim was not "inherently unknowable" prior to March 14, 2001. Rather, the Salemme opinion and media coverage prove that the factual basis of Plaintiff's FTCA claim was widely known and, more important, readily available to the public. A factual basis publicly available through a published judicial opinion and widely reported by the media cannot be labeled "inherently unknowable." Simply put, if the factual basis is known or readily known, it is by definition not "inherently unknowable."

    Moreover, inasmuch as Judge Wolf's Salemme opinion outlines the precise factual basis of Plaintiff's FTCA claim, it cannot be said that the factual basis for the claim was "inherently unknowable" after the opinion's release on September 15, 1999. Not only did the Salemme opinion provide Plaintiff with a virtual roadmap for her FTCA claim, the opinion unquestionably supplied the "sufficient information" needed to permit the FBI to begin to investigate the administrative claim. See Skwira, 344 F.3d at 78 n.15. Accordingly, Plaintiff's claim accrued by September 15, 1999, *at the latest.*

    Furthermore, under the circumstances presented here, a reasonably diligent plaintiff would have—at a minimum—been aware of the indictment and/or prosecution of those alleged to have murdered the decedent, the father of the Estate's beneficiaries.[2] Reasonable diligence in

---

    [1] United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999).

    [2]Unlike in Donahue v. FBI, 204 F. Supp. 2d 169 (D. Mass. 2002), Flemmi had been indicted for Walter Bennett's murder. See United States v. Francis P. Salemme, James J. Bulger,

following the well-publicized events of the prosecution would have necessarily led the children

directly to the discovery of the factual basis of the present FTCA claim years before, but certainly

no later than, the date of Judge Wolf's <u>Salemme</u> opinion.[3]

For these reasons, the factual basis of Plaintiff's injury was not "inherently unknowable"

before March 14, 2001.  Accordingly, Plaintiff's claim is time-barred under the discovery rule.

### 2.    Plaintiff's Affidavits Establish that Accrual Commenced Prior to March 14, 2001

Accrual commences "once a plaintiff knows, or in the exercise of ***reasonable diligence***

should know." <u>Skwira</u>, 344 F.3d at 78 (emphasis added).  "A plaintiff may not 'bury her head in

the sand.'" <u>Id.</u> at 77 (quoting <u>Diaz v. United States</u>, 165 F.3d 1337, 1340 (11th Cir. 1999)).

Rather, she must proceed with reasonable diligence.

Affiants Nancy Derderian (Opposition Exhibit 10), Barbara Ann Bennett (Opposition

Exhibit 11), and Susan Mary Bennett (Opposition Exhibit 12), acknowledge reading newspaper

articles that concerned the factual basis of the present FTCA claim and/or having direct contact

with the reporters covering the FBI-Flemmi-Bulger developments of the 1990s.  For example,

Susan Mary Bennett's affidavit states:

> 3.    With specific reference to the newspaper articles "list" (Dave Wedge, <u>Killing Field; Families look for closure at burial site,</u> BOSTON HERALD, Jan. 15, 200[0]; Shelley Murphy and John Ellement, <u>Search is Tied to Alleged Mob Hits: Police Dig in Gully</u>

---

<u>Stephen J. Flemmi, Robert P. Deluca, and James M. Martorano</u>, Crimn. No. 94-10827-MLW, Third Superseding Indictment, ¶ 1(e), p. 6 & Racketeering Act #23, pp. 33-34 (D. Mass.) (attached as Exhibit 1 to United States' Motion to Dismiss).

[3]Interestingly, both the Plaintiff's Opposition and accompanying affidavits omit discussion of the beneficiaries' knowledge of the indictment and prosecution of their father's murderers, despite these matters being raised by the United States.

> for Victims' Bodies, THE BOSTON GLOBE, January 14, 2000;
> Federal Investigators find 3 bodies in Boston believed tied to mob
> case, THE PATRIOT LEDGER (Quincy, Mass.) January 14, 2000)
> these were published at the time that they were looking for bodies
> and I was hoping that my father's body would be one of those they
> found. I did speak with reporters and expressed my thoughts that
> Flemmi was involved somehow in my father's death (contrary to
> the article I did not believe Bulger was involved). I remember
> skimming those articles looking for my father's name to see if he
> was among the bodies found. I was not looking for nor did I get
> anything else out of those articles. As a result of those
> circumstances and the emotional problems the search and these
> articles caused, I stopped reading or listening to anything to do
> with the whole matter.

The January 2000 articles that Susan Bennett admits reviewing expressly mention the fact

that Flemmi had been indicted for her father's murder, that Flemmi was an FBI informant, and

that he may have been protected from his crimes. These facts unquestionably would have led her

to the Flemmi-FBI revelations and the Salemme opinion had she been reasonably diligent.

The three articles that Susan Bennett read state:

> Susan Bennett said she "knows" fugitive Winter Hill boss James "Whitey"
> Bulger and Stephen "The Rifleman" Flemmi were involved in her father's death
> and hopes the family can someday have a proper burial. Flemmi, a former family
> friend of the Bennetts, has been jailed since 1995 and is awaiting trial on
> racketeering and murder charges. Among the killings he allegedly took part in are
> the deaths of the Bennett brothers.

Dave Wedge, Killing Field; Families look for closure at burial site, BOSTON HERALD, Jan. 15,

2000.

> Bulger and Flemmi, both longtime FBI informants, were indicted on
> federal racketeering charges in 1995. Last month, they were charged in a new
> indictment with their longtime FBI handler, John Connolly.

* * * *

5

> Flemmi is charged in the 1995 indictment with murdering four men in the 1960s gang wars, including two whose bodies have never been found: brothers Edward and Walter Bennett of Dorchester.

Shelley Murphy and John Ellement, <u>Search is Tied to Alleged Mob Hits; Police Dig in Gully for Victims' Bodies</u>, THE BOSTON GLOBE, Jan. 14, 2000.

> Flemmi, who has been jailed since 1995 after being indicted on federal racketeering charges, secretly worked as an FBI informant for decades while conducting mob business, according to federal court documents.
>
> Flemmi, Bulger and their FBI handler were charged in December in another federal racketeering indictment. It alleges that former Special Agent John J. Connolly Jr. protected Flemmi and Bulger from prosecution, and tipped them to the earlier indictment.

* * * *

> The 1995 indictment charges Flemmi with killing four men in 1960s gang wars. The bodies of two of the four presumed victims - - brothers Edward and Walter Bennett of Dorchester - - have never been found.

<u>Federal investigators find 3 bodies in Boston believed tied to mob case</u>, THE PATRIOT LEDGER (Quincy, Mass.), Jan. 14, 2000.

Having read these newspaper articles, Susan Bennett was not permitted to "bury her head in the sand." For this reason, her declaration that after reading the articles she "stopped reading or listening to anything to do with the whole matter" does not prevent accrual. Reasonable diligence required her to explore the information in the articles.

As fully briefed in the United States' Memorandum, the accrual rules as applied to Susan Bennett are imputed to the Estate. As such, Plaintiff's claim began to accrue—simply according to Susan Bennett's affidavit—no later than January 14, 2000. Because Plaintiff presented her administrative claim on March 14, 2003, it is barred by the two-year statute of limitations.

6

### 3.    Plaintiff's Search for Magic Words

Notwithstanding its effort to recharacterize the cited newspaper articles,[4] Plaintiff is unable to rebut the showing that a reasonable person would have been armed with sufficient facts to begin a timely investigation. As a result, Plaintiff resorts to asserting that none of the newspaper articles supporting the motion expressly stated that "Flemmi [was] operating with an informal 'license to kill'" and, therefore, the limitations period did not begin to run.

This argument is misdirected. First, Skwira establishes a reasonable person standard to measure whether there was "sufficient information for the agency to investigate the claims." See Skwira, 344 F.3d at 78, 78 n.15. Magic words are not required to provide sufficient facts to a reasonable person. Second, where a plaintiff is or should be aware of both the existence and cause of her injury, accrual is not delayed until she learns of the legal significance of those facts. United States v. Kubrick, 444 U.S. 111, 122-23 (1979). For these reasons, Plaintiff's search for magic words in the cited newspaper articles is not dispositive to the accrual issue before the Court.

Rather, an open review of the articles reveals "sufficient facts to permit a reasonable person to believe that there is a causal connection between the government and [Plaintiff's] injury." Id. Accordingly, the articles provided sufficient notice to commence accrual. Furthermore, at a minimum the articles provide sufficient information to prompt a reasonable person being reasonably diligent to seek discoverable information. Most apparent, the articles unquestionably demonstrate that the factual basis of the FTCA claim was not "inherently

---

[4]Plaintiff's Opposition discusses the sample of newspaper reports cited in the United States' Memorandum. See Opposition at 5-9. Throughout its discussion, the Opposition makes repeated mischaracterizations and omissions, which are addressed in Appendix A to this Reply.

unknowable" prior to March 14, 2001.

### C.    Plaintiff Applies an Incorrect Accrual Standard

Although Plaintiff acknowledges that First Circuit law provides that accrual under the discovery rule is measured by an objective standard, see Opposition at 4, she relies on a subjective analysis.  Plaintiff argues that the cited newspaper articles "must be backed up by facts proving that the Plaintiff was aware of these articles and read them." Opposition at 5.  This is a veiled attempt to convert Skwira's objective standard into a subjective one.  The affidavits attached to the Opposition provide further evidence of this effort.  In the affidavits, Walter Bennett's children allege that they did not see or read the newspaper articles identified by the United States and/or that they did not become aware of the factual basis for the FTCA claim until after March 14, 2001.

Under the "knew or should have known through reasonable diligence" standard set out in Skwira, however, the beneficiaries' *lack* of actual knowledge is irrelevant.  If the beneficiaries were not actually aware of the factual basis of the claim, then under Skwira, the question becomes whether they *should* have been aware through reasonable diligence.  This is an objective inquiry.  Furthermore, the affiants' lack of knowledge does not assist the Court in determining whether the factual basis for the FTCA claim was "inherently unknowable" prior to March 14, 2001.  This is because an "inherently unknowable" inquiry is an objective inquiry as well, wholly unfulfilled by claimed accounts of the beneficiaries' subjective lack of knowledge.

For these reasons, to the extent the affiants declare a lack of actual knowledge of the factual basis of the FTCA claim prior to March 14, 2001, such declarations are subjective in

nature and therefore legally irrelevant to the accrual issue before the Court.[5]

## II.    The Doctrines of Fraudulent Concealment and Equitable Tolling Do Not Save Plaintiff's Claim

To invoke the fraudulent concealment doctrine, Plaintiff must "show that the United States itself played a role in concealing the identity of the FBI tortfeasors; must plead with particularity the facts surrounding the concealment; and must be able to show due diligence in attempting to uncover those facts." Bennett, supra at 119.

Plaintiff has not pled with particularity facts that suggest that, in the face of an effort by Plaintiff to obtain facts sufficient to permit an agency investigation to commence, the FBI fraudulently concealed such facts. The Opposition's mere recitation of extensive portions of Bennett does nothing to cure this deficiency.

Moreover, as discussed ante, if Plaintiff was not aware of the factual basis for her FTCA claim prior to March 14, 2001, then Walter Bennett's eleven children did not proceed with reasonable diligence. Accordingly, neither fraudulent concealment nor equitable tolling save Plaintiff's claim from being time-barred. Regardless, any alleged wrongdoing on the part of the FBI would not have tolled the statute of limitations past September 15, 1999. This is because the alleged concealment would have become wholly ineffective upon the public release of Judge Wolf's opinion in Salemme.

Finally, Plaintiff's blanket assertion that FBI agent H. Paul Rico and several federal

---

[5]Articulating a more dissected framework, the Skwira standard includes an *affirmative subjective* prong ("once a plaintiff knows") and an *objective* prong ("or in the exercise of reasonable diligence should know"). In her Opposition, Plaintiff rests her argument solely on a *negative subjective* test, wherein, if Plaintiff did not actually know, accrual did not commence. The First Circuit has not adopted Plaintiff's *negative subjective* test because such a test is incompatible with Skwira's objective prong.

9

prosecutors had repeatedly denied any wrongdoing, and thus any due diligence on the part of

Walter Bennett's children would have therefore proved fruitless, does not satisfy Plaintiff's

burden of proof. Retroactive, hypothetical due diligence is a legally inadequate substitute for an

actual diligent attempt to uncover facts.

For these reasons, the doctrines of fraudulent concealment and equitable tolling do not

save Plaintiff's claims.

**III.    A Timely Administrative Claim is a Jurisdictional Prerequisite and the Date of Accrual of an FTCA Claim May be Decided on a Motion to Dismiss**

Plaintiff's contention that the United States' Motion to Dismiss is premature contravenes

First Circuit jurisprudence. Plaintiff cites three cases from outside the First Circuit for this

contention. See Opposition at 17-18. The First Circuit, however, has affirmed this Court's

dismissal on motion of an FTCA case for the failure to file a timely administrative claim.

Gonzalez v. United States, 284 F.3d 281 (1st Cir. 2002). Further, because filing an FTCA claim

within the limitations period is a jurisdictional prerequisite, Roman v. Townsend, 224 F.3d 24,

28 (1st Cir. 2000), the failure of Plaintiff to carry her burden of showing that her claim complies

with the statute of limitations requires dismissal of the action. FED. R. CIV. P. 12(h)(3)

("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction

of the subject matter, the court shall dismiss the action."). In the past two years alone this Court

has decided several motions to dismiss on statute-of-limitations grounds. See, e.g., McIntyre v.

United States, 254 F. Supp. 2d 183 (D. Mass. 2003).

/ /

/ /

10

## CONCLUSION

For the foregoing reasons, and the reasons discussed in the Memorandum of Points and

Authorities in Support, the United States' Motion to Dismiss should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

ALLEN L. LANSTRA
STACEY BOSSHARDT
Trial Attorneys, Torts Branch
Civil Division, U.S. Department of Justice
P.O. Box 888, Benjamin Franklin Station
Washington, D.C. 20044
(202) 616-4272; (202) 616-5200 (FAX)
Allen.Lanstra@usdoj.gov

Attorneys for the United States

Dated: April 23, 2004

11

# Appendix A

1. <u>Law Enforcement Officials' Lament about an Elusive Foe: Where was Whitey?</u>, THE
   BOSTON GLOBE, Sept. 20, 1998.
   - **United States' Motion to Dismiss, Exhibit 3.** Article cited to demonstrate media
     coverage of the FBI/Bulger/Flemmi relationship throughout the 1990s. *See* U.S.
     Memorandum of Points and Authorities in Support of United States' Motion to
     Dismiss ("Memorandum") at 4 n.5.
   - **Plaintiff's Opposition Exhibit 2(1).** Plaintiff states that the article contains "No
     suggestion of Flemmi operating with an informal 'license to kill'" and that it
     "Contains FBI denial." Plaintiff's Opposition to United States' Motion to Dismiss
     ("Opposition") at 5.
   - **Article Content.** Discussion of (1) "special relationship" between Bulger and the
     FBI; (2) Bulger and Flemmi's lucrative niche as mobsters in Boston; (3) the
     Bulger-Connolly tie as one questioned by other law enforcement, including some
     in the FBI; (4) quotes from an "elusive" Boston-FBI Special Agent in Charge and
     a denial from another, regarding Bulger's informant status (neither of who handle
     FTCA claims for the FBI); (5) DEA officials questioning the FBI's comments
     about their relationship with Bulger

2. Dick Lehr and Kevin Cullen, <u>Liquor Purchase Fuels Friction Over FBI-Whitey Bulger
   Tie</u>, THE BOSTON GLOBE, Nov. 11, 1990.
   - **United States' Motion to Dismiss, Exhibit 3.** Article cited to demonstrate media
     coverage of the FBI/Bulger/Flemmi relationship throughout the 1990s. *See*
     Memorandum at 4 n.5.
   - **Plaintiff's Opposition, Exhibit 2(2).** "No suggestion of Flemmi operating with
     an informal 'license to kill.'" *See* Opposition at 6.
   - **Article Content.** Discussion of (1) Bulger being an FBI informant; (2) the FBI's
     refusal to discuss its relationship with Bulger; (3) criticism that "nothing is done
     to FBI agents who allegedly fraternize and do business with gangsters; (4) Flemmi
     being Bulger's longtime partner and a reputed gangster; (5) a "widely held
     perception in law enforcement that Bulger has exploited the FBI"; (6) the FBI
     being held in the dark about state-local investigations of Bulger and Flemmi; and
     (7) allegations against Connolly.

3. Sean P. Murphy, <u>Tape Topic: FBI Link to Whitey Bulger</u>, THE BOSTON GLOBE, Feb. 8,
   1991.
   - **United States' Motion to Dismiss, Exhibit 3.** Article cited to demonstrate media
     coverage of the FBI/Bulger/Flemmi relationship throughout the 1990s. *See*
     Memorandum at 4 n.5.
   - **Plaintiff's Opposition, Exhibit 2(3).** "No suggestion of Flemmi operating with
     an informal 'license to kill.'" *See* Opposition at 6.
   - **Article Content.** Discussion of allegations that Bulger receiving special
     treatment from the FBI because he acted as an informant.

4.  Shelley Murphy, <u>Finding his Way Home; Reputed Crime Boss Returns to Old Haunts</u>, THE BOSTON GLOBE, July 31, 1994.
    - **United States' Motion to Dismiss, Exhibit 3.** Article cited to demonstrate media coverage of the FBI/Bulger/Flemmi relationship throughout the 1990s. *See* Memorandum at 4 n.5.
    - **Plaintiff's Opposition, Exhibit 2(4).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 6.
    - **Article Content.** Discussion of (1) Bulger's stint as an FBI informant helping him evade any charges; (2) Bulger being suspected of murdering rivals during Boston's gang wars in the 1960s; (3) Bulger's partnership with Flemmi; and (4) an anticipated indictment of Flemmi.

5.  Richard Chacon, <u>Three Reputed Mobsters have Longstanding Ties to Each Other</u>, THE BOSTON GLOBE, Jan. 6, 1995.
    - **United States' Motion to Dismiss, Exhibit 3.** Article cited to demonstrate media coverage of the FBI/Bulger/Flemmi relationship throughout the 1990s. *See* Memorandum at 4 n.5.
    - **Plaintiff's Opposition, Exhibit 2(5).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 6.
    - **Article Content.** Discussion of (1) Flemmi's role as the bridge between Bulger and Salemme; and (2) Bulger being insulated from arrest by the FBI by serving as an FBI informant, according to law enforcement officials.

6.  Dick Lehr, <u>Bulger's Flight Spares FBI Burden of Ties being Aired, Insiders Say</u>, THE BOSTON GLOBE, Mar. 5, 1995.
    - **United States' Motion to Dismiss, Exhibit 3.** Article cited to demonstrate media coverage of the FBI/Bulger/Flemmi relationship throughout the 1990s. *See* Memorandum at 4 n.5.
    - **Plaintiff's Opposition, Exhibit 2(6).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 6.
    - **Article Content.** Discussion of (1) the FBI's "tangled ties to the powerful gangster," Bulger; (2) the FBI's "marriage" to Bulger and "its controversial use of him as an informant"; and (3) Bulger-FBI ties dating back to the 1960s.

7.  Ellen O'Brien, <u>4 Murder Charges Added Against Flemmi, Salemme</u>, THE BOSTON GLOBE, May 22, 1996.
    - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media coverage in the 1990s regarding the Walter Bennett murder indictment and prosecution. *See* Memorandum at 6.
    - **Plaintiff's Opposition, Exhibit 2(7).** "Only mentions the adding of murder charges of Edward Bennett to Salemme and Flemmi" and "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 6.

2

- • **Article Content.** States that Flemmi has been charged with the 1967 murder of, among others, Walter Bennett—the Plaintiff's decedent.

8. Patricia Nealon, <u>Flemmi says he, Bulger got FBI's OK on crimes</u>, THE BOSTON GLOBE, June 26, 1997.
   - • **United States' Motion to Dismiss, Exhibits 2, 3, 4.** Article cited to demonstrate media coverage of the FBI/Bulger/Flemmi relationship throughout the 1990s, see Memorandum at 4 n.5, media coverage of Flemmi having a protected status with the FBI, see Memorandum at 4, and media coverage of the FBI-Flemmi relationship surrounding Judge Wolf's hearings. *See* Memorandum at 4 n.6.
   - • **Plaintiff's Opposition, Exhibit 2(8).** "Contains FBI denial" and "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 6.
   - • **Article Content.** Covering the prosecution of Flemmi for, inter alia, murdering Walter Bennett, the article (1) states that Flemmi asserted that an FBI contact assured him and Bulger that they could commit crimes without fear of prosecution; (2) reports that Flemmi and Bulger were FBI informants; (3) identifies inconsistent statements from FBI individuals pertaining to Flemmi and Bulger's alleged authority to commit crimes; and (4) quotes Flemmi's affidavit alleging that he was protected from his criminal activity.

9. Ralph Ranalli, <u>Ex-FBI man to testify at Mob trial</u>, BOSTON HERALD, Aug. 4, 1997.
   - • **United States' Motion to Dismiss, Exhibit 4.** Article cited to demonstrate media coverage of Flemmi's relationship with FBI after the prosecution of Flemmi commenced. *See* Memorandum at 4-5 n.6.
   - • **Plaintiff's Opposition, Exhibit 2(9).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 6.
   - • **Article Content.** Article (1) states that Rico met Flemmi in the early 1960s; (2) reports that only Flemmi and Bulger know how Rico convinced them to join forces with the FBI to bust the Italian Mob; (3) suggests that numerous sources say that Connolly merely inherited the relationship masterminded and nurtured by Rico and Condon; (4) explains that whether the relationship went too far would be a topic of hearings before Judge Wolf; (5) states that Judge Wolf had already ruled that Flemmi's attorneys had made a "substantial" showing of government misconduct; and (6) states that Rico began a "decades-long relationship" with Flemmi and Bulger.

10. Ralph Ranalli, <u>Did FBI get help 'flipping' Mob killer Barboza?</u>, BOSTON HERALD, Aug. 5, 1997.
    - • **United States' Motion to Dismiss, Exhibit 4.** Article cited to demonstrate media coverage of Flemmi's relationship with FBI after the prosecution of Flemmi commenced. *See* Memorandum at 4-5 n.6.
    - • **Plaintiff's Opposition, Exhibit 2(10).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 6.

3

- **Article Content.** Article (1) reports that Flemmi and Bulger had a "decades-long relationship" with the FBI; (2) previews hearings before Judge Wolf on "whether any laws or policies were violated in the FBI's use of informants and wiretaps"; (3) states that Rico and Condon were the architects of the Flemmi and Bulger FBI relationships; and (4) reports that Flemmi began providing information as early as 1964.

11. Ralph Ranalli, <u>Hearings may dig into FBI dealings with Mob</u>, BOSTON HERALD, Dec. 30, 1997.
    - **United States' Motion to Dismiss, Exhibit 4.** Article cited to demonstrate media coverage of Flemmi's relationship with FBI after the prosecution of Flemmi commenced. *See* Memorandum at 4-5 n.6.
    - **Plaintiff's Opposition, Exhibit 2(11).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 6.
    - **Article Content.** Article (1) states that hearings before Judge Wolf will provide a "wide-ranging exploration" of the FBI's relationship with Flemmi and Bulger; (2) reports that Judge Wolf will consider whether Flemmi was "given an 'informal' promise of immunity from prosecution by the FBI during several decades as a highly placed informant"; (3) suggests that "Flemmi and Bulger operated their own criminal enterprises with virtual impunity while federal agents and prosecutors looked the other way"; and (4) lists Connolly, Morris and Rico, as Bulger and Flemmi's FBI handlers.

12. Ralph Ranalli, <u>Mobster: I had license to kill; Flemmi says FBI knew he was murderer</u>, BOSTON HERALD, Jan. 7, 1998.
    - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media reports that Rico allegedly suborned perjury in order to assist Flemmi in getting charges dropped for murder and attempted murder, and that Rico tipped Flemmi off to the indictments so that he could flee Boston.
    - **Plaintiff's Opposition, Exhibit 2(12).** Acknowledges that the article mentions this case and Flemmi's informant status, but states that the article contains a denial from an Assistant U.S. Attorney prosecuting the criminal charges in the 1990s. *See* Opposition at 7.
    - **Article Content.** Reports that (1) Flemmi claims he was given a free pass on murder for being an FBI informant; (2) Flemmi was given immunity from criminal prosecutions; (3) Flemmi had already been a government witness at the time he was charged with the murder of William Bennett in 1969; (4) William Bennett was murdered after vowing to avenge the slayings of his two brothers, including Plaintiff's decedent Walter Bennett; (5) Flemmi claims he was warned of the indictments so that he could flee and was notified by Rico when it was safe to come back to Boston; and (6) Asst. U.S. Attorney Fred Wyshak, who does not represent the FBI in civil cases, calling Flemmi's immunity assertions "preposterous," which has no relation to a denial from the FBI as an agency.

13. Patricia Nealon, <u>FBI Loyalty to Mob Duo is Detailed; DEA, Others Kept in Dark about Bulger, Flemmi Ties</u>, THE BOSTON GLOBE, Jan. 9, 1998.
- **United States' Motion to Dismiss, Exhibit 3.** Article cited to demonstrate media coverage of the FBI/Bulger/Flemmi relationship throughout the 1990s. *See* Memorandum at 4 n.5.
- **Plaintiff's Opposition, Exhibit 2(13).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 7.
- **Article Content.** Article reports (1) Flemmi and Bulger were two of FBI's best snitches; (2) Flemmi and Bulger were FBI informants; (3) about several murders Flemmi and Bulger were believed to be involved with; and (4) Flemmi claims he could not be prosecuted because he was promised immunity by the FBI.

14. Shelley Murphy and Patricia Nealon, <u>Ex-agent Retraces Gang War; Tells How FBI Cultivated Mob Pair in Violent 60's</u>, THE BOSTON GLOBE, Jan. 10, 1998.
- **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media linkage of Flemmi, FBI and Bennett murders. *See* Memorandum at 5.
- **Plaintiff's Opposition, Exhibit 2(14).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 7.
- **Article Content.** Article covers (1) a 1965 dispatch to FBI director J. Edgar Hoover in which Rico suggests Flemmi would be a valuable informant; (2) Rico's 1998 testimony about whether he promised Flemmi immunity in exchange for his service as an FBI informant; (3) Rico's testimony about the Boston gang wars between Winter Hill and the McLaughlin gangs that took the lives of some 60 persons; (4) Bulger and Flemmi's leadership in the Winter Hill gang; (5) the fact that Flemmi had been indicted the murder of four men; and (6) Judge Wolf's hearings to decide whether an actual contract existed between Flemmi and the FBI, under which Flemmi would not be prosecuted for any crimes he committed in exchange for his service as an informant.

15. Ralph Ranalli, <u>Flemmi's lawyer contends fed let his crimes slide</u>, BOSTON HERALD, Jan. 14, 1998.
- **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media linkage of Flemmi, FBI and Bennett murders, see Memorandum at 4-5, and to show that the FBI was allegedly aware of Walter Bennett's disappearance as a result of communications from Flemmi. *See* Memorandum at 7.
- **Plaintiff's Opposition, Exhibit 2(15).** Admits that article reflects that Flemmi alleges that he had a free pass on murder, but states that the article contains an "FBI denial" by H. Paul Rico, even though Rico was no longer an FBI employee and, regardless, even though he never handled FTCA administrative claims for the FBI when he was an employee. *See* Opposition at 7.

- **Article Content.** Reports that (1) Flemmi's attorneys' attempt to show that Rico turned a blind eye toward crimes committed by Bulger and Flemmi, in exchange for their service as informants; (2) Flemmi and Bulger were "top echelon informants"; (3) Flemmi told the FBI it should not waste time looking for Walter Bennett; (4) Flemmi had been indicted for Walter Bennett's murder; (5) Flemmi is attempting to convince Judge Wolf "that the FBI granted him immunity and told him he didn't have to worry about prosecution as long as he kept bringing them inside information about the Mob"; (6) Rico denied ever making such a deal with Flemmi; and (7) Rico stated that pushing for criminal indictments against Flemmi and Bulger would have hurt the FBI's ability to develop other informants.

16. Patricia Nealon, <u>Ex-agent Denies Tipping off Flemmi</u>, THE BOSTON GLOBE, Jan. 15, 1998.
    - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media reports that Rico allegedly suborned perjury in order to assist Flemmi in getting charges dropped for murder and attempted murder, and that Rico tipped Flemmi off to the indictments so that he could flee Boston.
    - **Plaintiff's Opposition, Exhibit 2(16).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 7.
    - **Article Content.** Article reports that (1) Rico denied that he engineered Flemmi's surrender after Flemmi fled charges in 1969; (2) Flemmi has been indicted for murder; and (3) Flemmi and Bulger were FBI informants.

17. Ralph Ranalli, <u>Separate trials eyed for Mob defendants</u>, BOSTON HERALD, Aug. 25, 1998.
    - **United States' Motion to Dismiss, Exhibit 4.** Article cited to demonstrate media coverage of Flemmi's relationship with FBI after the prosecution of Flemmi commenced. *See* Memorandum at 4-5 n.6.
    - **Plaintiff's Opposition, Exhibit 2(17).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 7.
    - **Article Content.** Article reports that (1) Flemmi was indicted in January 1995; (2) Flemmi and Bulger held long informant relationships with the FBI; (3) Judge Wolf is holding hearings; (4) "In secret FBI documents made public during the hearings, Flemmi coyly talked with his bureau handlers in 1967 about Irish wiseguy Walter Bennett, who was missing and presumed murdered."; (5) "'[Flemmi] advised that the FBI should not waste any time looking for Walter Bennett in Florida nor any place else because Bennett is not going to be found,' Special Agent Paul Rico wrote in a report."; (6) "'[Flemmi] advised that he could not see any point in going into what happened to Walter, but that Walter's 'going' is all for the best and he was beginning to think aggressively and could have caused additional problems in the city,' Rico wrote."; (7) Flemmi and Salemme had been charged with murdering the Bennett brothers, including Walter; and (8) Flemmi may know more about the Walter Bennett murder than he's telling.

6

18. Ralph Ranalli, <u>Former FBI agent testifies Salemme's '72 bust no setup</u>, BOSTON HERALD, May 6, 1998.
   - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media coverage of allegations that FBI did not pursue Flemmi after he was accused of murdering the Bennett brothers. *See* Memorandum at 6.
   - **Plaintiff's Opposition, Exhibit 2(18).** "No suggestion of Flemmi operating with an informal 'license to kill,'" and "Mentions Edward Bennett case, FBI denies any duplicity in Salemme's 1972 arrest." *See* Opposition at 7.
   - **Article Content.** Article reports that (1) Condon had testified at hearings "delving into the FBI's controversial informant relationships" with Flemmi and Bulger; (2) "Defense lawyers for Flemmi, Salemme and three other wiseguys have alleged the bureau protected Flemmi and Bulger in exchange for intelligence on their Italian Mob rivals and even their own Winter Hill gang allies."; (3) Flemmi was on the run after being accused of killing the Bennett brothers, including Walter; (4) a denial by Condon that busting Salemme was not a Flemmi-FBI setup (however it should be remembered that Condon was not an FBI employee at the time of his testimony nor did he ever handle FTCA administrative claims for the agency during any time of his employment.)

19. Ralph Ranalli, <u>Mobster's plea deal reopens unsolved murder probes</u>, BOSTON HERALD, Aug. 9, 1998.
   - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate the public attention to Judge Wolf's hearings and the <u>Salemme</u> decision. *See* Memorandum at 6.
   - **Plaintiff's Opposition, Exhibit 2(19).** "No suggestion of Flemmi operating with an informal 'license to kill,'" and "No mention of this case." *See* Opposition at 7.
   - **Article Content.** Article reports that (1) Martorano has cut a deal with prosecutors to testify against Flemmi and Bulger in hearings that are exposing their informant relationships with the FBI; (2) Judge Wolf is holding hearings exploring allegations of serious FBI misconduct in the handling of informants Flemmi and Bulger; and (3) During Martorano's testimony, he is expected to discuss the murders of the three Bennett brothers.

20. Patricia Nealon, <u>On Mafia history, Flemmi takes a courtroom stand</u>, THE BOSTON GLOBE, Aug. 25, 1998.
   - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media linkage of Flemmi, FBI and Bennett murders. *See* Memorandum at 4-5.
   - **Plaintiff's Opposition, Exhibit 2(20).** "Flemmi claims immunity," "FBI denial," and "No suggestion of Flemmi operating with an 'informal license to kill.'" *See* Opposition at 7.

- **Article Content.** Article covers (1) Flemmi's testimony in the Wolf hearings; (2) Flemmi's invocation of his Fifth Amendment rights over 70 times; (3) Flemmi's refusal to talk about his role in several murders dating to the late 1960s; (4) Flemmi's evasiveness about his early contact with Rico; (5) "Flemmi's refusal to answer questions about the murders of the Bennett brothers, Edward, Walter and William F., who were killed within months of each other during a gangland war in 1967"; (6) Flemmi's decision to be more talkative regarding him being promised immunity in exchange for information he gave the FBI; (7) That present and former FBI agents and supervisors, including Rico, have denied that Bulger and Flemmi were given permission to commit crimes short of murder (although none represent the FBI regarding FTCA administrative claims); and (8) Rico's admission that the FBI never launched an investigation into Flemmi's criminal activity.

21. Ralph Ranalli, <u>Rifleman's refrain remains the fifth</u>, BOSTON HERALD, Aug. 25, 1998.
    - **United States' Motion to Dismiss, Exhibits 2, 4.** Article cited to demonstrate media linkage of Flemmi, FBI and Bennett murders, see Memorandum at 4-5, and to show concentration of media coverage surrounding Flemmi indictment and prosecution. *See* Memorandum at 4-5 n.6.
    - **Plaintiff's Opposition, Exhibit 2(21).** "No suggestion of Flemmi operating with an 'informal license to kill'" and "FBI denial." *See* Opposition at 8.
    - **Article Content.** Article (1) reports that Flemmi testified in a Boston federal court; (2) indicates that Flemmi refused to answer over 100 questions; (3) reports that Judge Wolf is holding hearings probing allegations of serious FBI misconduct in the handling of informants Flemmi and Bulger; (4) discusses the murders of all three Bennett brothers; (5) states that Flemmi said that Rico knew he was involved in serious crime; (6) discussing the allegation that Flemmi and Salemme strangled Walter Bennett and buried him next to his brother; and (7) that the joke among gang members was that "Walter and Wimpy are together playing whist."

22. Ralph Ranalli, <u>Flemmi mum about murders, but admits betraying close pal</u>, BOSTON HERALD, Aug. 29, 1998.
    - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate the public attention to Judge Wolf's hearings and the <u>Salemme</u> decision. *See* Memorandum at 6.
    - **Plaintiff's Opposition, Exhibit 2(22).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 7.
    - **Article Content.** Article reports that (1) Flemmi was an FBI informant; (2) Flemmi indicated during testimony that he had authority to commit crimes short of murder; (3) Judge Wolf is holding hearings exploring allegations of FBI misconduct in the handling of informants Flemmi and Bulger; and (4) Flemmi and Salemme allegedly murdered Edward, Walter and William Bennett in 1967.

23.    Joe Heaney, <u>Sons of slain men mixed on decision</u>, BOSTON HERALD, Dec. 10, 1999.
- **United States' Motion to Dismiss, Exhibit 2.** Article cited because members of the Bennett family were quoted in the article. *See* Memorandum at 7.
- **Plaintiff's Opposition, Exhibit 2(23).** "No suggestion of Flemmi operating with an 'informal license to kill'" and "William Bennett blaims [sp.] Flemmi (This William Bennett is cousin, son of Edward Bennett, and not the son of Walter Bennett)." *See* Opposition at 8.
- **Article Content.** Article (1) comments on the vanishing of Walter Bennett in 1967; (2) discusses Salemme's plea deal, which led to charges against Salemme for the murder of Walter Bennett being dropped; (3) states that "Walter Bennett's son, a 49-year-old Florida steel worker, also named William, said yesterday the Salemme deal left him disgusted with the criminal justice system."; (4) quotes William Bennett and Billy Bennett at length; (5) labels Flemmi an "FBI informer"; and (6) quotes Billy Bennett saying "[Flemmi] played both sides and the FBI, too."

24.    Andrea Estes, <u>'Tired' Mob boss ends fight, pleads guilty</u>, BOSTON HERALD, Dec. 10, 1999.
- **United States' Motion to Dismiss, Exhibit 2.** Article cited because members of the Bennett family were quoted in the article and the article mentions the investigation into the Flemmi-Bulger-FBI relationship. *See* Memorandum at 7-8.
- **Plaintiff's Opposition, Exhibit 2(24).** "No suggestion of Flemmi operating with an 'informal license to kill.'" *See* Opposition at 8.
- **Article Content.** The article (1) discusses how Salemme pled guilty to racketeering charges, but not four murder charges including the murder of Walter Bennett; (2) mentions that Flemmi will soon be a lone defendant; (3) states that Flemmi was an FBI informant; (4) states that prosecutors essentially dropped the Walter Bennett charge against Salemme; (5) notes that Flemmi is still charged with the Walter Bennett murder; (6) states that Walter Bennett vanished in 1967; (7) quotes Walter Bennett's daughter, Barbara Bennett, as saying that "she's not looking for vengeance, just answers."; (8) states, "Although Salemme's agreement doesn't require him to testify, he may talk to a grand jury investigating the relationships between Flemmi, Bulger and the FBI, according to sources."

25.    Shelley Murphy, <u>Salemme Pleads Guilty to Racketeering; Plea Deal Would Drop Murder Charges</u>, THE BOSTON GLOBE, Dec. 10, 1999.
- **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate the public attention to Judge Wolf's hearings and the <u>Salemme</u> decision. *See* Memorandum at 6.
- **Plaintiff's Opposition, Exhibit 2(25).** "No suggestion of Flemmi operating with an informal 'license to kill,'" and "Wolf rejects Flemmi's immunity." *See* Opposition at 8.

- **Article Content.** Article reports that (1) prosecutors indicated that they might drop charges against Salemme for, inter alia, the murder of Walter Bennett as a result of his plea; (2) "Bulger and Flemmi have been exposed during the case as longtime FBI informants"; (3) Flemmi and Bulger have tried to get the case dismissed against them because they were informants at the time of the alleged criminal activities; (4) FBI agents accepted bribes from Bulger and Flemmi; and (5) "In a 661-page ruling in September, [Judge] Wolf refused to dismiss the case after rejecting Flemmi's argument that the FBI promised him and Bulger protection from prosecution. But Wolf is planning more hearings and has barred prosecutors from using some evidence against Flemmi."

26. Federal investigators find 3 bodies in Boston believed tied to mob case, THE PATRIOT LEDGER (Quincy, Mass.), Jan. 14, 2000.
    - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media coverage of the Walter Bennett dig in January 2000, at which Walter Bennett's children are quoted in newspaper accounts. *See* Memorandum at 8.
    - **Plaintiff's Opposition, Exhibit 2(26).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 8.
    - **Article Content.** Article reports that (1) investigators were searching for the bodies of those murdered by Flemmi; (2) "Flemmi, who has been jailed since 1995 after being indicted on federal racketeering charges, secretly worked as an FBI informant for decades while conducting mob business."; and (3) "The 1995 indictment charges Flemmi with killing four men in 1960s gang wars. The bodies of two of the four presumed victims - - brothers Edward and Walter Bennett of Dorchester - - have never been found."

27. Shelley Murphy and John Ellement, Search is Tied to Alleged Mob Hits; Police Dig in Gully for Victims' Bodies, THE BOSTON GLOBE, Jan. 14, 2000.
    - **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media coverage of the Walter Bennett dig in January 2000, at which Walter Bennett's children are quoted in newspaper accounts. *See* Memorandum at 8.
    - **Plaintiff's Opposition, Exhibit 2(27).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 8.
    - **Article Content.** Article reports that (1) "Armed with new information possibly linking reputed South Boston crime Boss James "Whitey" Bulger and his longtime cohort, Stephen "The Rifleman" Flemmi, to murder, federal and state investigators began digging yesterday . . . for the bodies of two Quincy men."; (2) "Bulger and Flemmi, both longtime FBI informants, were indicted on federal racketeering charges in 1995. Last month, they were charged in a new indictment with their longtime FBI handler"; and (3) "Flemmi is charged in the 1995 indictment with murdering four men in the 1960s gang wars, including two whose bodies have never been found: brothers Edward and Walter Bennett of Dorchester."

28.    Dave Wedge, <u>Killing Field; Families look for closure at burial site</u>, BOSTON HERALD, Jan. 15, 2000.

- **United States' Motion to Dismiss, Exhibit 2.** Article cited to demonstrate media coverage of the Walter Bennett dig in January 2000, at which Walter Bennett's children are quoted in newspaper accounts. *See* Memorandum at 8.
- **Plaintiff's Opposition, Exhibit 2(28).** "No suggestion of Flemmi operating with an informal 'license to kill.'" *See* Opposition at 8.
- **Article Content.** The article (1) quotes Susan Bennett, Walter Bennett's daughter; (2) states that Susan Bennett said she knew Flemmi and Bulger were involved in her father's death; and (3) indicates that Susan Bennett was present at the burial site, presumably because "news spread across the city that the bodies of three suspected Mob war victims had been unearthed from a Dorchester dumping ground."

11

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2004, I caused to be served upon the following counsel a true and correct copy of the United States' Motion for Leave to File Brief in Reply to Plaintiff's Opposition to United States' Motion to Dismiss, Proposed Order, and United States' Reply to Plaintiff's Opposition to Motion to Dismiss, by Federal Express to:

Paul J. Gannon, Esq.
Francis J. Hurley, Esq.
Gannon and Hurley, P.C.
P.O. Box E46
470 West Broadway
South Boston, MA 02127

Peter Parker, Esq.
One Commercial Wharf North
Second Floor
Boston, MA 02110

Allen L. Lanstra