UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
JOAN BENNETT,                               )
as Administratrix of the Estate of          )
Walter Bennett,                             )
                    Plaintiff,              )   CIVIL ACTION NO. 04-10011-RCL
                                            )
        v.                                  )
                                            )
THE UNITED STATES OF AMERICA, et al.,       )
                    Defendants.             )
_____)

MEMORANDUM AND ORDER ON THE MOTION
OF THE UNITED STATES TO DISMISS

LINDSAY, District Judge

**I.   INTRODUCTION**

This action is brought against the United States[1] by the Estate of Walter Bennett ("the Estate"), of which Joan Bennett is administratrix.[2] The case arises out of the murder of Walter

---

[1] The complaint also names as a defendant, H. Paul Rico ("Rico"), who at times relevant to the complaint, was a special agent or special agent in charge of the FBI office in Boston. This case is one of several assigned to me that raise the issue of the liability of the United States and certain agents of the Federal Bureau of Investigation ("FBI") for the murder of individuals by informants of the FBI. In the lead case, *Estate of McIntyre v. United States*, C.A. No. 01-10408-RCL, a suggestion of the death of Rico was filed on January 20, 2004, just two weeks after the commencement of this action. The Estate in this action has neither served a representative of Rico's estate with the complaint nor filed a motion to substitute another party for defendant Rico. I therefore consider the United States to be the sole defendant in this action.

[2] Walter Bennett's two brothers, William and Edward, were also killed in 1967. I have previously addressed a motion of the United States to dismiss in an action similar to this brought by the Estate of William Bennett. *Bennett ex rel. Estate of Bennett v. FBI*, 278 F. Supp. 2d 104 (D. Mass. 2003). A third action against the government brought by Edward Bennett's relatives is also pending before me. *See Bennett v. United States*, C.A. No. 03-11443-RCL. In addition, I have dismissed a companion action to this case brought individually by the surviving children of Walter Bennett on the ground that the claims asserted in the companion case belong to the Estate and may not be brought by individuals. *Bennett v. United States,* 389 F. Supp. 2d 121 (D. Mass. 2005).

Bennett on or about December 23, 1967. The complaint alleges that Stephen J. Flemmi ("Flemmi") committed the murder.[3] At the time of the murder, Flemmi was both a leader of the Winter Hill Gang, a clandestine criminal organization, and an informant of the FBI. The Estate asserts that the United States is liable for the death of Walter Bennett because the FBI, including former FBI agent Paul Rico, allowed Flemmi to engage in wide-ranging criminal activity with impunity, including the murder of Walter Bennett.

The complaint is in four counts. Counts II through IV assert claims against the United States for negligence, civil conspiracy, and wrongful death. The Estate purports to bring its claims against the United States pursuant to the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346, 2401, 2671 *et seq.* The United States has filed a motion to dismiss all of the claims against it for lack of subject matter jurisdiction, asserting that the Estate failed to present an administrative claim to the appropriate federal agency within two years of the accrual of the claim, as required by the FTCA, 28 U.S.C. § 2401(b). The Estate presented its administrative claim on or about March 14, 2003. To be viable under § 2401(b), the claims made in this case, therefore, cannot have accrued earlier than March 14, 2001. The United States contends that the claims accrued by September 1999 at the latest.

---

[3]The complaint alleges that Flemmi participated in the murder of Walter Bennett on December 23, 1967. However, most sources indicate that Walter Bennett disappeared in April 1967, and that December 23, 1967, is the date on which Flemmi participated in the murder of *William* Bennett. *See Bennett*, 278 F. Supp. 2d at 107 (reciting the plaintiff's allegation that Flemmi murdered William Bennett on December 23, 1967); *see also* Shelley Murphy, *Ruling Weakens Case Against Flemmi: Prosecutors Rebuked, Key Testimony Barred*, Boston Globe, July 6, 2000, at B1, *available at* 2000 WLNR 2290396 (stating that Walter Bennett disappeared on April 10, 1967). However, because the actual date of Walter Bennett's murder is not material to my consideration of the motions now before me, I accept the complaint's recitation of the date as accurate for purposes of the present motion.

For the reasons stated below, I hold that the Estate did not file its administrative claim within the relevant two-year period of limitations, and I grant the motion to dismiss of the United States.

## II.    BACKGROUND

**A.    Overview**

In considering the present motion, I have employed what the First Circuit calls the "sufficiency" method of reviewing challenges to subject matter jurisdiction. Under this approach, I "accept[] the plaintiff's version of jurisdictionally-significant facts as true" and "assess whether the plaintiff has propounded an adequate basis for subject-matter jurisdiction." *Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). In doing so, I "credit the plaintiff's well-pleaded factual allegations ( . . . taken from the complaint, . . . augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in [the plaintiff's] favor, and dispose of the challenge [to subject matter jurisdiction] accordingly." *Id.* Specifically, in this case, I have considered the complaint of the Estate as well as ten affidavits[4] attached to the plaintiff's opposition to the motion of the United States ("Pl.'s Opp."). I also have considered the opinion of Judge Mark L. Wolf of this court in *United States v. Salemme*, 91 F. Supp. 2d 141 (D. Mass. 1999), *rev'd in part*, 225 F.3d 78 (1st Cir. 2000), *cert. denied,* 531 U.S. 1170 (2001). I have relied also on certain press reports that the government attached to its memorandum in support of its motion ("U.S. Mem."), with particular focus on two newspaper articles relating to criminal proceedings underlying the *Salemme* opinion.

---

[4]    Each of the affiants purports to be a beneficiary of the Estate.

3

### B.     Factual Allegations Concerning the Death of Walter Bennett

The following allegations are made in the complaint.

In 1965, Rico recruited Flemmi as a confidential informant for the FBI, in the hope that Flemmi would provide useful information to the FBI in its investigation of La Cosa Nostra ("LCN"), a criminal organization whose activities were subject to the jurisdictional authority of the FBI. Compl. ¶¶ 23, 27, 28. In return for Flemmi's assistance in investigating LCN, Rico promised Flemmi that he would not be prosecuted for crimes he committed while serving as an informant. *Id.* ¶ 25. At the time Flemmi became an informant for the FBI, the FBI knew that Flemmi was engaged in serious criminal activity in the Boston area, and that Flemmi would continue to engage in such activities. *Id.* ¶¶ 26, 29, 35. Despite Flemmi's history of criminal activity - - activity that continued while he was an FBI informant - - the FBI designated him a "Top Echelon" informant in February 1967. *Id.* ¶ 24.

Among the criminal activities engaged in by Flemmi during his relationship with the FBI was involvement in the murder of Walter Bennett's brother Edward "Wimpy" Bennett. *Id.* ¶ 41. Flemmi admitted to Rico that he (Flemmi) was involved in Edward Bennett's murder. *Id.* Because Rico knew of Flemmi's involvement in that murder and his involvement in other criminal activities, Rico knew or should have known, before Walter Bennett's murder, that Flemmi posed a danger to the life of Walter Bennett, and that, in fact, Flemmi had made a decision to murder Walter Bennett. *Id.* ¶¶ 43-44. Despite his knowledge of, and ability to prevent, Walter Bennett's impending murder by Flemmi, Rico did nothing to forestall the murder. *Id.* On or about December 23, 1967, Flemmi murdered Walter Bennett. *Id.* ¶ 46. Although Rico had information relating to Walter Bennett's murder, he did not provide this information to law enforcement officers investigating the murder. *Id.* ¶ 47. Rico assisted and participated in Walter Bennett's

4

death in order to strengthen and solidify Flemmi's criminal operations and thereby assure that Flemmi would continue to provide the FBI with critical information about LCN. *Id.* ¶ 48.

After the murder of Walter Bennett, Flemmi continued to provide information to Rico regarding the activities of LCN. *Id.* ¶ 49. Accordingly, Rico repeatedly protected Flemmi from investigation and prosecution for his various crimes, including the murder of Walter Bennett. *Id.* ¶¶ 50-55, 57-59.[5]

**C.      The *Salemme* Decision**

On September 15, 1999, Judge Wolf issued his findings and conclusions in *Salemme*. In those finding and conclusions, the judge made observations about the role played by Rico in protecting Flemmi from investigation and prosecution relating to Flemmi's various criminal activities. *Salemme*, 91 F. Supp. 2d at 176-183. Judge Wolf found that "Rico promised that he would not tell anyone outside the FBI that Flemmi was an informant." *Id.* at 177. To this end, "Rico never disclosed information provided by an informant . . . to a prosecutor, either to prompt an investigation of the informant or to strengthen a prosecution of him." *Id.* Judge Wolf explained that, "[a]s far as Rico was concerned, the promise of confidentiality made to Flemmi or any other informant would endure even if Rico learned that the informant had broken the law." *Id.* Rico gave this promise of confidentiality despite "suspicions that Flemmi was a murderer." *Id.* at 179. Judge Wolf also observed: "In addition to promising 'protection,' . . . Rico said, in various ways, that Flemmi would not be prosecuted for crimes he was committing while serving as an informant." *Id.* at 181. Rico placed false statements in Flemmi's informant file to divert

---

[5]The complaint further alleges that Rico failed to document his contacts with Flemmi in so-called Form 209s, as required by FBI regulations. *Id.* ¶¶ 30-32. According to the complaint, even in the instances in which Rico completed the Form 209, he included misleading or false information about his relationship with Flemmi. *Id.* ¶ 32.

attention from his crimes and/or FBI misconduct. *Id.* at 178. Further, "[a]lthough Rico and his FBI colleagues often worked closely with state investigators and prosecutors in organized crime matters, there is no evidence that they contributed to any investigation of Flemmi regarding the murders of the Bennetts." *Id.* at 182. Of particular importance to this case, Judge Wolf reported in *Salemme* that the government was then prosecuting Flemmi for, among other things, having "participated in the murders of Wimpy Bennett [and] his brothers Walter and William Bennett . . . ." *Id.* at 181-82.

**D.    Media Reports**

On January 14, 2000, an article appeared in a local newspaper in the Boston area, the *Patriot Ledger*, concerning a search by federal investigators of a vacant field in Boston "for possible victims of reputed mobster Stephen 'The Rifleman' Flemmi buried there years ago." *Federal Investigators Find 3 Bodies in Boston Believed Tied to Mob Case*, Patriot Ledger (Quincy, Mass.), Jan. 14, 2000, *available at* 2000 WLNR 7301498 (the "*Patriot Ledger* article"), U.S. Mem., Ex. 3. This article notes that Flemmi, who "has been jailed since 1995 after being indicted on federal racketeering charges, secretly worked as an FBI informant for decades while conducting mob business." *Id.* The article attributes this information to "federal court documents." *Id.* The article later refers to a "1995 indictment charg[ing] Flemmi with killing four men in 1960s gang wars," including "brothers Edward and Walter Bennett," whose bodies "have never been found." *Id.* The article also mentions "another federal racketeering indictment" against Flemmi; his alleged underworld associate and fellow FBI informant, James J. Bulger ("Bulger"); and their FBI handler, John J. Connolly ("Connolly"), in which the government alleged that Connolly "protected Flemmi and Bulger from prosecution, and tipped them to [an] earlier indictment." *Id.* Susan Bennett, a beneficiary of the Estate, admits that she read this

6

article.  Affidavit of Susan Mary Bennett ("S. Bennett Aff.") ¶ 3, Pl.'s Opp., Ex. 12.

A day after the *Patriot Ledger* article was published, Susan Bennett was quoted in another article concerning the search for Flemmi's victims that appeared in a separate Boston area newspaper, the *Boston Herald*.  *See* Dave Wedge, *Killing Field; Families Look for Closure at Burial Site*, *Boston Herald,* Jan. 15, 2000, *available at* 2000 WLNR 228832 (the "Wedge article"), U.S. Mem., Ex. 6.  A significant portion of the article is dedicated to Susan Bennett's reaction to the search for her father's body:

> "I believe the guys who did this, their day will come," said a teary-eyed Susan Bennett, daughter of missing Walter Bennett.
>
> Susan Bennett, 43, is one of Walter Bennett's 13 kids and was just 11 when he disappeared in 1967 along with his brother, Edward "Wimpy" Bennett.  Wimpy Bennett, 47, is believed to have been shot to death, while sources say Walter was strangled after he began searching for his brother's killers.
>
> Susan Bennett said she "knows" fugitive Winter Hill boss James "Whitey" Bulger and Stephen "The Rifleman" Flemmi were involved in her father's death and hopes the family can someday have a proper burial.  Flemmi, a former family friend of the Bennetts, has been jailed since 1995 and is awaiting trial on racketeering and murder charges.  Among the killings he allegedly took part in are the deaths of the Bennett brothers.
>
> "It's been very hard.  My father was a wonderful family man.  A lot of children have been hurt by this," she said. "But I'm not angry anymore.  We just want to finalize this and put it to rest."

*Id.*  Susan Bennett acknowledges that she read this article.  S. Bennett Aff. ¶ 3.  In the affidavit she filed in connection with the present motion, she does not contest the accuracy of the statement that she knew Flemmi was involved in the murder of her father, although she does claim that she did not believe Bulger was involved in the murder:  "I did speak with reporters and expressed my thoughts that Flemmi was involved somehow in my father's death (contrary to the article I did not believe Bulger was involved)."  *Id.* ¶ 3.

### III.  DISCUSSION

7

**A.     Accrual of Claims under the FTCA Generally**

A claim brought against the United States under the FTCA "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ." 28 U.S.C. § 2401(b). The timely filing of the administrative claim under § 2401 is a jurisdictional requirement. *Rakes v. United States*, — F.3d — , 2006 WL 726683 at *8 (1st Cir. Mar. 23, 2006); *Skwira v. United States*, 344 F.3d 64, 73 (1st Cir. 2003), *cert. denied*, 542 U.S. 903 (2004). In addition, because the FTCA is a waiver of sovereign immunity by the United States, it must be strictly construed. *United States v. Kubrick*, 444 U.S. 111, 117-18 (1979).

"The general rule, within the meaning of the FTCA, is that a tort claim accrues at the time of the plaintiff's injury." *Skwira*, 344 F.3d at 73 (quoting *Atallah v. United States*, 955 F.2d 776, 779 (1st Cir. 1992)). In *Kubrick,* however, the Supreme Court created a "discovery" exception to the general accrual rule for medical malpractice claims brought under the FCTA, 444 U.S. at 119-202. Under this discovery rule, a claim accrues when the plaintiff knows of both the existence of the injury and its causes. *Id.* The First Circuit "has applied the discovery rule [to a claim under the FTCA] outside of the medical malpractice context, making of it a general rule." *Rakes*, 2006 WL 726683, at *9. As applied to cases like the one now before me, in which a government employee is alleged to have done some intentional - - perhaps criminal - - act and a government agency is alleged to have negligently supervised the employee, "a claim does not accrue under the FTCA until a person in the plaintiff's position, that is, one who knew or should have known as much as the plaintiff knew or should have known, would believe that he had been injured and would know 'sufficient facts to permit a reasonable person to believe that there is a causal connection between the government and [the] injury.'" *Id.* (quoting *Skwira*, 344 F.3d at

8

78) (alteration in original).[6]

As the preceding discussion makes clear, "[t]he test for whether a plaintiff should have discovered necessary facts is an objective one," requiring, in the first instance, a determination "whether sufficient facts were available [at the time in question] to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further." *McIntyre v. United States,* 367 F.3d 38, 52 (1st Cir. 2004). The First Circuit has explained that a "mere hunch, hint, suspicion, or rumor of a claim" is insufficient to trigger accrual of a claim, but such suspicions do trigger "a duty to inquire into the possible existence of a claim in the exercise of due diligence." *Id.* (quoting *Kronisch v. United States,* 150 F.3d 112, 121 (2d. Cir. 1998)). Moreover, a plaintiff cannot defeat the reasonable diligence requirement by "bury[ing] her head in the sand." *Skwira*, 344 F.3d at 77 (quoting *Diaz v. United States,* 165 F.3d 1337, 1339 (11th Cir. 1999)). "Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation." *McIntyre*, 367 F.3d at 52.

The court then asks whether the plaintiff, if armed with the results of his or her

---

[6]In *Rakes*, the First Circuit explicates the discovery rule as a test of what "the injured party knew, or, in the exercise of reasonable diligence, should have known," *Rakes*, 2006 WL 726683, at *9. A few paragraphs later, in characterizing the statute of limitations as "in part a rule of repose," the First Circuit states that the court will "charge plaintiffs with the knowledge *the government* reasonably ought to have expected them to have." *Id.* (emphasis added). I confess to some puzzlement at the First Circuit's decision to add to its explanation of the discovery rule a discussion of what the government should reasonably expect a plaintiff to know. Surely, the information the government may reasonably expect a plaintiff to know cannot be different from the information "the injured party knew, or, in the exercise of reasonable diligence, should have known." *Id.* Accordingly, I do not understand the court in *Rakes* to have constructed a *new* statement of the discovery rule, but rather to have restated the established rule that *Rakes* itself embraces (as discussed in the text of this memorandum *infra*), namely that a cause of action accrues under the FTCA when a person in the plaintiff's position has "sufficient facts to permit a reasonable person to believe that there is a causal connection between the government" and the injury as to which complaint is made. *Id.* (internal quotation marks and citation omitted).

investigation, "would know enough to permit a reasonable person to believe that she had been injured and that there is a causal connection between the government and her injury." *Id.* "Definitive knowledge is not necessary. This inquiry is highly fact- and-case specific, as are the pertinent questions to ask." *Id.* I have recently written that the "knowledge" required to trigger accrual of an FTCA claim not only "is far from definitive [but] suggests a host of epistemological possibilities" that vary with the circumstances of the case. *Callahan v. United States*, 337 F. Supp. 2d 348, 360 (D. Mass. 2004), *aff'd*, 426 F.3d 444 (1st Cir. 2005). Respecting the degree of certainty of the knowledge that triggers accrual, the First Circuit has said variously that such knowledge may be any one of the following:

> "sufficient facts to permit a reasonable person *to believe* that there is a causal connection between the government and her injury;" "*aware[ness]* of [an] injury and its *probable* cause;" being "informed" that it was "*highly possible*" a known injury resulted from particular medical treatment;" "*notice* of the injury and its *potential* cause; "'hav[ing] *reason to believe*' that the government was responsible for the injury," and "hav[ing] *some indication* that there *may have been* a government cause of the injury."

*Id.* (quoting *Skwira*, 344 F.3d at 78).

**B.      The Accrual of the Claims of the Estate**

When the plaintiff in an action is an estate, the question arises as to the *person* whose knowledge determines the point at which the *estate* knew or should have known of its injury and the injury's causal connection to government. Citing *Bennett*, 278 F. Supp. 2d at 113-14, the government argues that, "where a beneficiary has full authority to file an administrative claim under the FTCA, the beneficiary's knowledge regarding the claim attaches to the estate." U.S. Mem. at 10. The Estate does not object to this statement of the law, but argues instead that *none* of the beneficiaries of the Estate knew or should have know prior to March 14, 2001 of the government's alleged role in the death of Walter Bennett. In fact, in the final paragraph of each

10

beneficiary's affidavits attached to the plaintiff's opposition to the motion of the United States, the beneficiary swears, "It was not until October of 2003, when Steven Flemmi agreed to a pleas [sic] agreement, which included testifying against former FBI agent H. Paul Rico . . . did I become aware of any facts and/or suspicions that H. Paul Rico could be directly involved in the actual murder of father Walter Bennett."

In *Bennett,* 278 F. Supp.2d 104, I held that it was appropriate to consider the knowledge of the named plaintiff's brother, William Bennett, Jr., in assessing the accrual of the estate's claim against the United States although William Bennett, Jr. was not named as a plaintiff in that case. *Id.* at 114. I grounded my holding on the fact that William Bennett, Jr., as a beneficiary under state law, had "full authority to file the administrative claim with the FBI." *Id.* (citing *Booten v. United States*, 95 F. Supp. 2d 37, 42 (D. Mass. 2000)). I also pointed to the reasoning and apt language employed by Judge Ponsor in rejecting an argument that only knowledge of the named plaintiff was relevant to the accrual of an estate's FTCA claim:

> No support exists for this argument, and it flies in the face of both of applicable authority and practicality. No statute of limitations would have meaning if it were possible to avoid it simply by appointing a putative Rip Van Winkle as the estate administrator and plaintiff. . . . Thus the discovery rule does not require recalculation of the statute of limitations in light of the subjective knowledge, or ignorance, of each potential plaintiff. The [discovery rule] exception [to the general accrual rule] applies only when the cause of action is 'inherently unknowable,' . . . not when it merely happens to be unknown by a particular potential plaintiff.

*Id.* (quoting *Cutting v. United States,* 204 F. Supp. 2d 216, 227 (D. Mass. 2002), *aff'd sub nom. Skwira v. United States*, 344 F. 3d 64 (1st Cir. 2003)).

As noted earlier, Susan Bennett is a beneficiary of the Estate: she was one of the eleven surviving children of Walter Bennett at the time the administrative claim in this matter was filed. *See Bennett v. United States,* 389 F. Supp. 2d 121 (D. Mass. 2005). As such, she was a statutory

11

beneficiary of the Estate with "full authority to file the administrative claim with the FBI." *Bennett v. FBI*, 278 F. Supp. 2d 104, 114 (D. Mass. 2003) (citing *Wozniak v. United States,* 701 F. Supp. 259, 260-61 (D. Mass. 1988)). Because she appears to have been the most informed of the statutory beneficiaries concerning the facts material to the administrative claims, it is appropriate to view the accrual of the Estate's claim from her perspective. *See Bennett*, 278 F. Supp. 2d at 114.

Susan Bennett acknowledges that she read some of the articles that purport to quote her and are attached to the government's motion. S. Bennett Aff. ¶ 2. In particular, she recalls "skimming" three articles around the time of the search for the bodies of Flemmi's victims, including the *Patriot Ledger* article and the Wedge article.[7] *Id.* ¶ 3. She also acknowledges that

---

[7] The First Circuit said in *Rakes*: "At some point, facts achieve a local notoriety great enough that the only practicable course is to attribute knowledge of them to people in a position to become familiar with them." *Rakes*, 2006 WL 726683, at *9. The court also suggested, however, that "mere availability" of facts is not enough to trigger the imputation, *id.* (citing *Cascone v. United States*, 370 F.3d 95 (1st Cir. 2004)). Rather, a court considering attribution of knowledge of such facts to a potential FTCA plaintiff still must consider "the depth of the information available and . . . the breadth of that information's circulation," *id.*, and that undertaking is always fact-intensive, *see McIntyre*, 367 F.3d at 60. Determining the point at which it is appropriate to conclude that facts have achieved such local notoriety that knowledge of them may be imputed to an FTCA plaintiff is not always an easy task. In the present case, as the United States points out, information material to the claim of the Estate was published in daily newspapers in the Boston area during the 1990s. U.S. Mem. at 6. Publication of an event in a daily newspaper, of course, makes the facts of that event "available"; however, the inquiry does not end there: I note, for example, that, according to publicly available information, the two newspapers with the largest circulation in the Boston area reach only a fraction of the population. The *Boston Globe* has an estimated daily readership of 31% of the adults in the greater Boston metropolitan area, and the *Boston Herald* has an estimated daily readership of 21% of the adults in the same area. Thirty-seven percent of those who read the *Herald* also read the *Globe*; therefore, only approximately 44% of the adults in the greater Boston area read at least one of these newspapers. *See* https://bostonglobe.com/advertiser/mrktdata/bostonglobemrkt/readership/dailydupl.pdf (last visited March 30, 2006). (Another source reports even lower readership numbers, stating that the *Boston Globe* has daily readership of 22% of adults, and that the *Boston Herald* has daily

she spoke to either all or some of the reporters working on the articles. *Id.*

As detailed above, one of the articles reported that Flemmi "secretly worked as an FBI informant for decades while conducting mob business"; that Flemmi had been indicted in 1995 for killing the Bennett Brothers (including Walter Bennett); and that the government also had indicted at the same time an FBI agent who had protected Flemmi from prosecution and tipped him to an impending indictment. *Patriot Ledger* article. A second article quoted Susan Bennett as having said that she knew that Flemmi was involved in Walter Bennett's murder (a statement which she acknowledges having made) and reported again the allegation that Flemmi was involved in the murders of the Bennett Brothers. Wedge article. I find that a reasonable person in Susan Bennett's position, upon reading the articles, would have been provoked to investigate further into the circumstances of the death of her father, Walter Bennett.[8]

Had she investigated further, Susan Bennett would have learned the third fact material to the accrual of her claim. Because the *Patriot Ledger* article identified a specific federal indictment charging Flemmi with the murder of Walter Bennett, the reasonably diligent plaintiff would have

---

readership of 15%. *See* http://advertising.washpost.com/the_newspaper/post-vs-top10/reach-daily.jsp (last visited March 30, 2006)). Still, as explained in the text above, there is ample reason to impute to the Estate knowledge of information contained in the *Patriot Ledger* and Wedge articles.

[8]It is of no moment that Susan Bennett, in her carefully-worded affidavit, says that she "skimmed" the *Patriot Ledger* article. S. Bennett Aff. at ¶ 3. Despite her statements, it is appropriate to charge her, and thus the Estate, with knowledge of the information reported in this article because "the reasonably diligent plaintiff would have read the . . . article[s] for which she had been interviewed," *Callahan*, 337 F. Supp. 2d at 365.

started her inquiry with that indictment.[9]  From reading the indictment, she would have been led to Judge Wolf's opinion in *Salemme*, and his description of Rico's role in protecting and encouraging Flemmi in his criminal activities.  *Salemme*, 91 F. Supp. 2d at 176-183.[10]  The reasonably diligent plaintiff thus would have become aware of the claim that the FBI had a special relationship with Flemmi that protected and encouraged him in his criminal activity, including Bennett's murder.

Indeed, every material fact in the Estate's complaint regarding the relationship between Rico and Flemmi was revealed in the *Salemme* opinion.  *Compare Salemme*, 91 F. Supp. 2d at 176-183 (documenting the relationship between Rico and Flemmi), *with* Compl. ¶¶ 22-55 (setting forth the relationship between the FBI and Flemmi).  In addition, specific portions of the complaint cite the *Salemme* opinion.  *See, e.g.,* Compl. ¶ 43.  Thus, there is no question that *Salemme* would have provided Susan Bennett with enough information to bring a claim against the government for its involvement in her father's death.  This is true whether the Estate seeks to hold the government liable on a theory of vicarious liability (i.e., that, as Rico's employer, the government is liable for his misconduct), or direct liability (i.e., negligent supervision).  *See Rakes*, 2006 WL 726683, at *11 ("A negligent supervision theory of recovery is the sort that is normally

---

[9]It would have required very little effort for a reasonably diligent person in Susan Bennett's circumstances to go to the federal courthouse in January 2000 and review the indictment.  She lives within minutes of this courthouse by public or private transportation.  *See* S. Bennett Aff. ¶ 1 (stating that Susan Bennett resides in Dorchester, Massachusetts).

[10]The proceedings in *Salemme* arose directly from the indictment charging Flemmi with the murder of, among others, Walter Bennett.  *See United States v. Francis P. Salemme, James J. Bulger, Stephen J. Flemmi, Robert P. Deluca, and James M Martorano*, Crim. No. 94-10287-MLW, Third Superseding Indictment, ¶ 1(e) at p. 6 & Racketeering Act #22 at p. 33 (D. Mass. May 21, 1996), U.S. Mem., Ex. 2.

14

considered . . . in *any* case where the primary injury was caused by a rogue lower-level employee.").

Charging Susan Bennett with knowledge of the result of an investigation that would have lead her inevitably to *Salemme*, I find that a reasonable person in Susan Bennett's circumstances would have known by at least January, 2000 of the causal connection between the government and the death of Walter Bennett. Because the knowledge of Susan Bennett is imputable to the Estate, I find that the Estate did not file its administrative claim within two years of the date it accrued.[11]

---

[11] Although I dispose of this motion based on the constructive knowledge of Susan Bennett, I note that it appears that other beneficiaries of the Estate failed diligently to investigate a possible claim against the United States. For example, Barbara Bennett, another of Walter Bennett's daughters, was quoted in a December 10, 1999 article. *See* Andrea Estes, *'Tired' Mob Boss Ends Fight, Pleads Guilty*, Boston Herald, Dec. 10, 1999, *available at* 1999 WLNR 278728 (the "Estes article")), U.S. Mem., Ex. 3. The article points out that "Flemmi is still charged with the 1967 gangland style slaying of Grasso and Edward, Walter and William Bennett." *Id.* It also reports that Flemmi's co-defendants had "recently learned [that Flemmi] was an FBI informant who exposed [the co-defendants'] exploits." *Id.* The article specifically references Judge Wolf's decision in *Salemme*. *Id.* In her affidavit, Barbara Bennett neither contests the authenticity of the Estes article nor challenges the accuracy of the statement attributed to her therein. Affidavit of Barbara Ann Bennett ¶ 4, Pl.'s Opp., Ex. 11. Nancy Derderian, another beneficiary of the Estate, acknowledges having read the Wedge article. Affidavit of Nancy Derderian ¶ 3, Pl.'s Opp., Ex. 10.

Moreover, because the other beneficiaries of the Estate have not explicitly declared estrangement from each other and many of them live in the Boston metropolitan area, one may assume that Susan Bennett was in communication with them. *See Rakes* 2006 WL 726683, at *12 (noting that a person in the plaintiffs' position would come to have information material to the accrual of an FTCA claim "through the channels of communication that run among people connected through ties of neighborhood, community, friendship and family . . ."; *see also McIntrye*, 367 F.3d at 60-61 (imputing mother's knowledge to plaintiff, for purposes of assessing the accrual of FTCA claim, because "nothing in the record shows that Pamela was estranged from her mother").

15

**D.      Equitable Tolling and Fraudulent Concealment**

The Estate argues that the FBI's alleged denial of any involvement in the murder of Walter Bennett "raises and presents facts which support the doctrine of equitable tolling and fraudulent concealment." Pl.'s Opp. at 16.  The premise of both of these doctrines is that, where a claim has already accrued, "considerations of justice and equity require allowing an extension of time for filing."  *Rakes*, 2006 WL 726683 at *14; *see also Gonzalez v. United States*, 284 F.3d 281, 292 (1st Cir. 2002); *Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20, 25 (1st Cir. 1997); *Gonzalez-Bernal v. United States*, 907 F.2d 246, 250 (1st Cir. 1990).  It is well settled that "[i]n order for a plaintiff to prevail on a fraudulent concealment claim, the defendant must have engaged in fraud or deliberate concealment of material facts relating to his wrongdoing and the plaintiff must have failed to discover these facts within the normal limitations period despite his exercise of due diligence."  *Callahan*, 426 F.3d at 454 (internal quotation marks omitted).  Similarly, "[t]he doctrine of equitable tolling suspends the running of the statute of limitations if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit."  *Gonzalez*, 284 F.3d at 291.

Here, the Estate cannot avail itself of either tolling doctrine because, to the extent that information essential to the claim of the Estate was fraudulently concealed by the government or otherwise unavailable, Judge Wolf's extensive factual findings in *Salemme* uncovered any recondite information material to the claims at issue in this case.  Moreover, the doctrines of fraudulent concealment and equitable tolling do not preserve the Estate's claims because, as noted above, the Estate was not diligent in investigating possible claims.  *See Rakes*, 2006 WL 726683, at *15; *Gonzalez*, 284 F.3d at 291.

## IV.  CONCLUSION

For the foregoing reasons, I hold that the Estate has not satisfied the presentment requirement of 28 U.S.C. § 2401(b).  The motion of the United States to dismiss for lack of subject matter jurisdiction (docket entry 3) is GRANTED, and all of the Estate's claims against the United States are hereby dismissed.

Although H. Paul Rico, now deceased, is named as a defendant in this action, the Estate has not made any efforts to prosecute this action against his Estate, see note 1, *supra*.  With the claims against the United States dismissed, there are no remaining claims in this action.  I therefore order that this case be dismissed as to all parties.  The clerk will make the appropriate entry on the docket and terminate this case.

SO ORDERED.

                                            /s/ REGINALD C. LINDSAY
                                            United States District Judge

DATED: March 31, 2006